Rutherford Elec. Membership Corp. v. Time Warner Entm't/Advance-Newhouse P'ship, 2014 NCBC 20.

STATE OF NORTH CAROLINA

RUTHERFORD COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
13 CVS 231

RUTHERFORD ELECTRIC
MEMBERSHIP CORPORATION,

        Plaintiff,

v.

TIME WARNER
ENTERTAINMENT/ADVANCE-
NEWHOUSE PARTNERSHIP, d/b/a
TIME WARNER CABLE, and TIME
WARNER CABLE SOUTHEAST, LLC,

        Defendants.

**ORDER AND OPINION**

*Nelson Mullins Riley & Scarborough, LLP, by Joseph W. Eason, Christopher J. Blake, and Phillip A. Harris, Jr., for Plaintiff Rutherford Electric Membership Corporation.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, by Reid L. Phillips, and Sheppard Mullin Richter & Hampton, LLP, by Gardner F. Gillespie, Paul A. Werner and J. Aaron George for Defendants Time Warner Entertainment-Advance/Newhouse Partnership and Time Warner Cable Southeast LLC.*

Murphy, Judge.

{1}    THIS MATTER came before the Court for trial without a jury on September 3, 2013, to resolve claims and counterclaims asserted by Plaintiff Rutherford Electric Membership Corporation ("Plaintiff") and Defendants Time Warner Entertainment-Advance/Newhouse Partnership ("TWEAN") and Time Warner Cable Southeast LLC ("TWC Southeast") (collectively, "Defendants"). The parties' various claims all relate to the rates Plaintiff charged Defendants to attach their communications wires and associated facilities to Plaintiff's utility poles. Having considered the evidence presented by the parties at trial, the parties' pre- and post-trial briefs, and the arguments and contentions of counsel, the Court finds, concludes, and orders as follows:

I.

REGULATORY BACKGROUND

{2}     Networks for transmitting and distributing electric power and telecommunications have historically been built above ground using utility poles placed in public rights of way, usually along existing roads and highways.  While underground construction is often used now to extend utility service within new residential subdivisions and business parks, utility plant remains above ground in older areas.

{3}     Owing to numerous factors, including local zoning, environmental, and aesthetic considerations, there is typically only one set of utility poles in any given area.  Consequently, the utility – either the power company or the incumbent local telephone provider – will install a single set of poles that it shares with the other utilities and third-party attachers, such as cable operators and competitive communications providers.  In exchange, the third-party attachers pay the utility a pole attachment rate.

{4}     In North Carolina, the power company utilities consist of various investor-owned utilities ("IOU(s)"), municipally-owned utilities and non-profit electric membership corporations ("EMC(s)").

{5}     For approximately thirty-five (35) years, the Federal Communications Commission ("FCC") has regulated the rates IOUs may charge cable television providers seeking to attach to their utility poles within North Carolina and other states pursuant to the federal Pole Attachment Act of 1978, codified as 47 U.S.C. § 224 ("Section 224").  Among other things, Section 224 mandates just and reasonable pole attachment rates, terms and conditions for cable television providers, and vests the FCC with oversight and enforcement.  47 U.S.C. § 224(b) (2014).

{6}     Specifically, Congress instructed the FCC to constrain the rates IOUs charge for pole attachments within a zone of reasonableness between (i) the utility's "incremental" or "but for" costs incurred in providing a pole attachment service, at the low end, and (ii) an appropriate share of its "fully allocated" costs – those costs

that would exist even in the absence of any pole attachments – at the high end.  47 U.S.C. § 224(d); S. Rep. No. 95-580, at 19–20 (1977).

{7}     Acting pursuant to Section 224, the FCC developed and implemented a fully allocated cost methodology to determine the upper limit for a rate an IOU could charge a cable television provider, known as the FCC Cable Rate formula.

{8}     In 1996, Congress amended Section 224 to authorize the FCC to develop regulations that would allow an IOU to charge a telecommunications carrier a rate based on a different method than the FCC Cable Rate formula, known as the FCC Telecom Rate formula.  In 2011, the FCC changed the FCC Telecom Rate formula to produce rates similar to the FCC Cable Rate.  As a result, there is now a new FCC Telecom Rate formula.  As intended, the new FCC Telecom Rate produces a rate limit close to the FCC Cable Rate.

{9}     While the federal Pole Attachment Act allows states to preempt FCC regulation in this area by making a certification to the FCC, North Carolina has never made such a certification.

{10}    However, since 1978, Congress has exempted municipally-owned utilities and EMCs such as Plaintiff from the federal Pole Attachment Act and the federal regulatory scheme administered by the FCC.  *See* 47 U.S.C. § 224(a)(1).

{11}    Because of this exemption, EMC pole attachment rate-setting effectively went unregulated.  Thus, communications and cable television providers, like Defendants, were left to seek out other means to challenge rates set by EMCs.  In 2007, TWEAN attempted to challenge the rates set by another North Carolina EMC before the United States Court of Appeals for the Fourth Circuit under common law principles.  However, the court rebuffed TWEAN's attempt, holding that "if any regulation or compulsion is to be applied to pole-attachment agreements, it should be done by the North Carolina legislature, the North Carolina Utilities Commission, [or] the North Carolina state courts." *Time Warner Entertainment-Advance/ Newhouse P'ship v. Carteret-Craven Elec. Membership Corp.*, 506 F.3d 304, 315 (4th Cir. 2007).  In response, the North Carolina General Assembly enacted N.C. Gen. Stat. section 62-350 ("§ 62-350").

II.

POLE ATTACHMENT REGULATION UNDER § 62-350

{12}   As enacted in July 2009, § 62-350 mandates that municipalities and EMCs organized under Chapter 117 of the North Carolina General Statutes "shall allow any communications service provider to utilize [their] poles, ducts, and conduits at just, reasonable, and nondiscriminatory rates, terms, and conditions adopted pursuant to negotiated or adjudicated agreements." N.C. GEN. STAT. § 62-350(a) (2013). Included in the definition of "communications service provider" are those that provide "cable service over a cable system as those terms are defined in Article 42 of Chapter 66 of the General Statutes." § 62-350(e). The statute further provides that:

> Following receipt of a request from a communications service provider, a municipality or membership corporation shall negotiate concerning the rates, terms, and conditions for use of or attachment to the poles, ducts, or conduits that it owns or controls. . . . Upon request, a party shall state in writing its objections to any proposed rate, terms, and conditions of the other party.

§ 62-350(b).

{13}   However, if "the parties are unable to reach an agreement within 90 days . . . or if either party believes in good faith that an impasse has been reached . . ., either party may bring an action in Business Court . . ., and the Business Court shall have exclusive jurisdiction over such actions." § 62-350(c). In that event, the statute directs the Business Court to do the following:

> resolve any dispute identified in the pleadings consistent with the public interest and necessity so as to derive just and reasonable rates, terms, and conditions, taking into consideration and applying such other factors or evidence that may be presented by a party, including without limitation the rules and regulations applicable to attachments by each type of communications service provider under [Section 224], and [] apply any new rate adopted as a result of the action retroactively to the date immediately following the expiration of the 90-day negotiating period or initiation of the lawsuit, whichever is earlier.

§ 62-350(c).

{14}     The North Carolina Court of Appeals interpreted "§ 62-350 to establish several judicially-enforceable statutory rights." *Time Warner Entm't Advance/Newhouse P'ship v. Town of Landis*, 747 S.E.2d 610, 616 (2013). "For instance, . . . § 62-350 creates a statutory right for both communications service providers and municipalities to establish 'just, reasonable, and nondiscriminatory' pole attachment rates within 90 days of a request to negotiate." *Id.* (quoting § 62-350(c)). The court also held that "the statute expressly creates a private cause of action to enforce these rights." *Id.* (citation omitted).

III.

PROCEDURAL HISTORY

{15}     On March 1, 2013, Plaintiff filed its Complaint concerning the rates, terms, and conditions governing Defendants' attachment of its communications wires and facilities to Plaintiff's utility poles. Specifically, Plaintiff alleged three claims for relief: (1) adjudication under N.C. Gen. Stat. § 62-350 of the lawfulness of its rates for 2010 through 2013 and its non-rate terms and conditions for 2013; (2) declaratory relief as to its rates and "rate methods"; and (3) declaratory relief as to non-rate terms and conditions.

{16}     Thereafter, Plaintiff filed notice of designation to the North Carolina Business Court. On March 7, 2013, the case was designated a mandatory complex business case, and assigned to this Court on March 12, 2013.

{17}     On April 4, 2013, TWEAN filed its Answer, Affirmative Defenses, and Counterclaim, alleging that: (1) Plaintiff's pole attachment rates for 2010 through 2013 are unjust and unreasonable in violation of § 62-350; (2) Plaintiff's unilateral pole attachment rate increases for the years 2010 through 2013 are unauthorized and in violation of § 62-350; (3) Plaintiff's requirement that TWEAN subject its overlashing of pre-existing attachments to a full permitting process is unjust, unreasonable, and discriminatory; and (4) Plaintiff's "unauthorized" attachment penalties are unjust and unreasonable, in violation of § 62-350.

{18}     On May 20, 2013, the Court *sua sponte* asked the parties to address the following jurisdictional questions:

> 1. Does Plaintiff Rutherford have standing to bring the issues in dispute? Alternatively, is a case or controversy present that permits the Court to adjudicate Plaintiff's claims?
>
> 2. Does Section 62-350(c) comply with the separation of governmental powers enshrined in Article I, section 6 of the North Carolina Constitution? Does Section 62-350(c) affect a delegation of legislative authority that violates Article II, section 1 of the North Carolina Constitution?

*Rutherford Elec. Membership Corp. v. Time Warner Entm't Advance/Newhouse P'ship*, No. 13 CVS 231 (N.C. Super. Ct. May 20, 2013) (order posing questions to the parties).

{19} The parties submitted responses to the Court's questions, and the Court heard oral argument on July 15, 2013.

{20} On June 18, 2013, Plaintiff filed a Motion to Dismiss the Counterclaim as to the 2013 rate and on-going non-rate terms and conditions, on the basis that TWEAN lacked standing because TWC Southeast – who was not a party to the case at that time – was the real party in interest. TWEAN filed its response to Plaintiff's Motion to Dismiss on July 2, 2013, and its Motion to Join TWC Southeast as a necessary party on July 3, 2013. After the parties fully briefed both motions, the Court heard argument on Plaintiff's Motion to Dismiss and TWEAN's Motion to Join TWC Southeast on July 31, 2013.

{21} On August 1, 2013, the Court entered an Order addressing its jurisdictional questions, denying Plaintiff's Motion to Dismiss, and granting TWEAN's Motion to Join TWC Southeast as a party to the case. Regarding its jurisdictional questions, the Court held that Plaintiff had standing to pursue its claims, and that Plaintiff sufficiently alleged a prior injury or loss to establish a controversy. *Rutherford Elec. Membership Corp. v. Time Warner Entm't-Advance/Newhouse P'ship*, No. 13 CVS 231 (N.C. Super. Ct. Aug. 1, 2013) (order addressing Court's questions, Plaintiff's Motion to Dismiss, and TWEAN's Motion to Join TWC Southeast).

{22} In its Order, the Court further concluded that "its concerns regarding the constitutionality of Section 62-350 are not at issue in this litigation," based on the

parties' representations that the Court "need only determine whether the rate adopted by Plaintiff was just and reasonable." Accordingly, the Court has jurisdiction and may constitutionally resolve the parties' disputed issues in this litigation. *Id.* at ¶ 10.

{23} Prior to trial, the parties advised the Court that they settled their disputes over Plaintiff's non-rate terms and conditions, and that the only disputed issue remaining for resolution by the Court is whether Plaintiff's rates for 2010 through 2013 were just and reasonable under § 62-350.

{24} On September 3, 2013, the Court began a four-day bench trial on the reasonableness of Plaintiff's rates from 2010 through 2013. In lieu of closing arguments, the parties submitted post-trial briefs and replies.

IV.

FINDINGS OF FACT

A.

PARTIES

{25} Plaintiff is an EMC organized under Chapter 117 of the North Carolina General Statutes that owns and operates an electric distribution system consisting of overhead and underground lines used to provide electric service to its members in its service territory, covering all or portions of ten (10) North Carolina counties. As part of its system, Plaintiff owns utility poles to which it attaches its overhead electric distribution lines. Plaintiff also licenses the use of space on its poles to communications service providers, and allows telephone companies and other electric utilities to use its poles under "joint-use" arrangements.

{26} Defendants are franchised cable operators throughout communities in North Carolina, offering various communications services to residential and business customers.

{27} TWEAN is a New York general partnership with its principal place of business in New York, New York, and formerly operated as a cable system operator and communications service provider within the meaning of § 62-350(e) from July

10, 2009 through September 30, 2012. As a result of corporate restructuring in 2012, TWEAN stopped providing communication services directly to consumers.

{28} Effective September 30, 2012, TWEAN transferred all of its rights, obligations, and liabilities relating to cable operations in North Carolina to its operating subsidiary, TWC Southeast, a Delaware limited liability company based in New York, New York. TWC Southeast has been a cable system operator and a communications service provider within the meaning of § 62-350(e) beginning October 1, 2012, and continuing until the present. For purposes of this action, TWC Southeast adopted and ratified all actions taken by TWEAN related to this litigation from the date of restructuring until the present.

{29} Since 1998, Defendants have maintained attachments to poles owned or controlled by Plaintiff.

B.

BACKGROUND ON POLE ATTACHMENTS

{30} Utility poles come in standard sizes, typically in five-foot increments. Utilities usually use 35- and 40-foot poles for distribution of electricity and communications services. Indeed, for the past 25 years, Plaintiff has used a standard 40-foot pole. Of that space, utilities bury approximately six feet of the pole underground. Then, to meet "minimum grade" and achieve ground clearance, the utility leaves presumably at least 18 feet of pole space unused between the ground and any installation. As such, every pole has roughly 24 feet of unusable space either buried underground or required to achieve minimum ground clearance. Thus, each 35- and 40-foot pole has 11 feet and 16 feet, respectively, of usable space to accommodate overhead facilities. According to the property records in evidence, Plaintiff's poles average roughly 37.5 feet in height, and thus, would have a presumptive average of 13.5 feet of usable space.[1] [2]

---

[1] The FCC also uses a presumptive average of 13.5 feet of usable space in its calculation for maximum just and reasonable rates under the FCC Cable Rate formula.

[2] Plaintiff's expert challenges Defendants' reliance on these presumptive numbers, and argues that Plaintiff's actual data should be used to derive the average usable and unusable space. The Court does not disagree. However, as discussed further below in footnote 4, Plaintiff's actual data does not support the numbers relied on by Plaintiff's expert. And, in the absence of actual data, the Court

{31}    Of the usable space, Plaintiff uses between 6.5 and 10 feet for its attachments of electric distribution facilities.[3]  Incumbent local telephone companies, like BellSouth Telecommunications, Inc. ("Bell South"), may have more than one attachment on poles, and generally occupy between one and two feet of pole space.  Defendants and other third-party attachers occupy one foot of usable space each.

{32}    For poles with communications facilities, the National Electric Safety Code ("NESC") requires sufficient "safety space" between the communications facilities and electrical conductors, typically 40 inches.[4]  The NESC allocates this space for communications workers to maintain the communications facilities attached to the poles.  However, under the provisions of the NESC, the electric utilities may also use the safety space for certain types of attachments provided they maintain minimum separations.  Plaintiff in fact uses the safety space on at least some of its poles for streetlight installations, a revenue-generating service.

{33}    By dividing the total number of attachments by the total number of poles on its system, Plaintiff claimed an average of 1.45 attachments per pole system wide.  However, Plaintiff did not know how many of its poles have multiple third-party attachments.  And, the evidence demonstrated that at least some of Plaintiff's poles have two, three, or four third-party attachments.

C.

THE PARTIES' POLE ATTACHMENT RELATIONSHIP

{34}    Like other electric service providers that own poles, Plaintiff licenses the use of space on its poles to communication service providers, like Defendants.  As of

---

will rely on the presumptive limits proffered by Defendants and applied by the FCC and the National Rural Electric Cooperatives' Association.

[3] According to Plaintiff's expert, Plaintiff follows the rural utility service construction standards which allocate the top 6.5 feet of each pole to the electric cooperative.  However, it appears that Plaintiff is entitled to use more than that, if necessary, and in fact, demands 8.5 feet of space under its agreement with BellSouth Telecommunications, Inc.  Indeed, Defendants' witness, Nestor Martin, testified that "[t]ypically the top 9, 10 feet are reserved for power services . . . ."  (Trial Tr. 510:7–8.)

[4] Pursuant to § 62-350(a), EMCs, like Plaintiff, must "require [third-party attachers] to comply with applicable safety requirements, including the NESC . . . ."  § 62-350(a).

December 31, 2012, Plaintiff had nine (9) third-party attachers, excluding Defendants, with license agreements to affix attachments to its poles.

{35}    On March 5, 1998, TWEAN and Plaintiff entered into a pole attachment agreement.  (Joint Ex. 2; Stip. No. 12.)  Under the terms of the parties' agreement, TWEAN was obligated to pay an annual, per-pole rental rate of $5.25, for all years of the agreement.  In exchange, TWEAN could attach to surplus space on Plaintiff's poles.  Where surplus space did not exist, including sufficient safety space and ground clearance, TWEAN had to create space by purchasing a new, larger pole, entirely at its expense.  Even where TWEAN paid to install a new, larger pole to make room for its attachments, Plaintiff took ownership of the new pole, and Defendants had to pay the same rate to attach to the pole.  (Joint Ex. 2 §§ 1a–6.)  Similarly, if Plaintiff reclaimed certain space on the pole for its own attachments, TWEAN either had to move its attachment to create new safety space or, if there was insufficient space to maintain minimum requirements for ground clearance or safety space, pay to install a taller pole.

{36}    In 2004, Plaintiff terminated the 1998 pole attachment agreement.  (Stip. No. 12.)  The parties exchanged drafts of a new agreement over the next eight years, including a template agreement approved by Plaintiff's board in 2012, but the parties could not agree on the rates, terms, and conditions of a new agreement.

{37}    Nonetheless, Plaintiff continued to invoice Defendants for their attachments.  For the years at issue in this case, Plaintiff invoiced Defendants for attachments on the following number of poles: 7,269 poles in 2010; 7,336 poles in 2011; 7,336 poles in 2012; and 7,384 poles in 2013.

D.

PLAINTIFF'S RELATIONSHIP WITH JOINT POLE USERS

{38}    In addition to license agreements with communications and cable television providers, Plaintiff also entered into a number of joint use arrangements with other electric utilities and telephone companies that own poles, including Bell South.  Under these joint use arrangements, the other pole owners and Plaintiff

each allow the other party to place facilities on their poles. As of trial, Plaintiff had four joint users attached to its poles.

{39} In Plaintiff's joint use arrangements with other electric utilities, Plaintiff typically does not pay for its use of space on the other utility's poles, nor does it charge the other utility for using space on its poles. Instead, the joint user will pay the pole owner for any expenses associated with accommodating the joint user's facilities. For example, due to the electric utilities' heavy attachments, Plaintiff (or the electric utility joint user) must pay to install taller, stronger poles to accommodate joint use by two electric utilities.

{40} On the other hand, under Plaintiff's joint use arrangement with telephone companies like Bell South, Plaintiff agreed that it would install, at its own expense, poles large enough to insure sufficient space for Bell South to make an attachment. Accordingly, if a jointly used pole is insufficient in size or strength to accommodate existing attachments and Bell South's proposed attachments, Plaintiff agreed to promptly replace the pole with a taller, stronger one at Plaintiff's expense.

{41} Bell South and Plaintiff also agreed to use a 40-foot pole as the "standard joint use pole" with a "standard space allocation" of two feet for Bell South's attachments and 8.5 feet for Plaintiff's attachments. (Def. Ex. 8.) Plaintiff also gave Bell South priority by specifying that any attachments by third parties would "not be located within the [two feet of] space allocation of [Bell South]." (Def. Ex. 8, Art. XIV.B.) In exchange, Bell South agreed to pay $12.45 per pole, and to supply its own 40-foot poles for Plaintiff's joint use at an annual pole rate to Plaintiff of $17.16. As of 2012, Bell South paid $18.12 per pole for 18,335 attachments to Plaintiff's poles, and Plaintiff paid $24.98 for each of its 1,026 attachments to Bell South's poles.[5]

---

[5] The Court notes that Bell South's annual rates funded two feet of pole space on each pole. In other words, Bell South initially agreed to pay roughly $6.00 per foot of pole space, and as of 2012, it paid $9.06 per foot of pole space.

E.

THE PARTIES' DISPUTE

{42}    Pursuant to the 1998 pole attachment agreement, Plaintiff originally charged TWEAN a pole attachment rate of $5.25.  Plaintiff increased the rate in 1999 to $5.50 and charged that amount until 2005.  After terminating the 1998 agreement, Plaintiff invoiced Defendants the following per pole attachment rates from 2005 through 2013:

    2005: $7.50
    2006: $9.50
    2007: $11.50
    2008: $12.50
    2009: $14.50
    2010: $15.50
    2011: $18.50
    2012: $19.19
    2013: $19.65

{43}    In 2004, Plaintiff hired Thomas Haire, P.E. ("Haire"), as a system engineer.  One of Haire's initial responsibilities was to oversee the development and negotiation of the rates, terms and conditions for attachment agreements.  During his analysis, Haire reviewed the "Pole Attachment Toolkit" (the "Toolkit") published by the National Rural Electric Cooperatives' Association ("NRECA"), an organization that provides education and training for EMCs like Plaintiff.  The Toolkit included four formulaic rate methodologies for calculating potential rates: (i) the FCC Cable Rate, (ii) the FCC Telecom formula, (iii) the "Telecom Plus" formula, and (iv) the "Maine" method.  Haire used only the first three methods because these three all use data inputs from the pole owner's books and records, and rely on essentially the same data and calculations but with different allocation factors.  At trial, Haire testified that he did not rely on any one calculation, but instead, wanted to get a range of potential rates.

{44}    Using this analysis, Plaintiff began gradually increasing its attachment rates to bring all rates for attachment closer to those charged under the agreement with Bell South.

{45} Until 2009, Defendants lacked any means to challenge Plaintiff's rates. Therefore, although Plaintiff terminated its contract with TWEAN in 2004, Defendants continued to pay the amounts invoiced by Plaintiff for pole attachments until 2009.

{46} On December 18, 2009, after the enactment of § 62-350, TWEAN objected to Plaintiff's invoiced rates, and requested negotiations for the rate, terms and conditions of a new license agreement pursuant to § 62-350. Over the next 39 months, the parties negotiated in good faith, exchanged draft agreements and discussed pole rates. However, the parties failed to reach an agreement, and Plaintiff continued increasing its rate each year.

{47} TWEAN objected to Plaintiff's 2010 rate of $15.50, and instead, paid Plaintiff only $14.50 per pole, subject to a true-up based on a negotiated or adjudicated rate and without prejudice to either party. In response, Plaintiff stated that, if TWEAN did not pay the full invoiced amount for 2010, it would demand removal of 481 TWEAN attachments, which was the number of poles equal to the amount of the outstanding balance. TWEAN responded by letter asserting that Plaintiff did not have the authority to unilaterally raise its rates or remove TWEAN's attachments. Thereafter, TWEAN continued to pay $14.50 per pole in 2011 and 2012, subject to true-up and without prejudice. Plaintiff continued to demand payment of the unpaid invoices. Defendants offered to pay Plaintiff's invoices for 2013 at a rate of $7.50, but Plaintiff objected and refused to accept such payment. As such, TWC Southeast still owes payment for 2013.

{48} Unable to bridge their different views of the maximum permissible rates under § 62-350 for the years 2010 through 2013, the parties reached an impasse as to these rates in February 2013, after years of attempted negotiation.

{49} As this dispute progressed, the other third-party attachers, including Charter Communications ("Charter"), paid Plaintiff's invoices, and entered agreements with Plaintiff governing pole attachment rates, terms, and conditions. Indeed, as of trial, Defendants were the only attachers to Plaintiff's poles without a contract. Specifically, Charter accepted the rates set forth in the form contract

presented by Plaintiff. However, it appears from the record that Charter did not want to litigate or risk not being able to complete pending projects if its permits were delayed during a dispute. Despite agreeing to pay Plaintiff's rates, a Charter representative testified that it believes the rates to be unreasonable.

F.

RATES CHARGED BY OTHER POLE OWNERS IN NORTH CAROLINA

{50} Defendants presented evidence that the highest pole attachment rates charged to Defendants by an IOU in North Carolina, regulated according to the FCC Cable Rate in the years 2010 through 2013, were: $6.79 in 2010; $6.40 in 2011; $7.67 in 2012; and $7.70 in 2013. The average rate Defendants paid to North Carolina IOUs over the same time period ranged from a high of $6.06 in 2010 to a low of $5.91 in 2012. The highest rate Defendants paid to an incumbent telephone company in North Carolina over that time period is $6.25, and the average rate ranged from a high of $5.03 in 2010 to a low of $3.28 in 2013.

G.

ANALYZING PLAINTIFF'S RATES

{51} In vesting this Court with the exclusive jurisdiction to resolve disputes regarding pole attachment rates charged by EMCs, the General Assembly articulated a policy for this Court to implement. It required the Court to "tak[e] into consideration and apply[] such other factors or evidence that may be presented by a party, including without limitation the rules and regulations applicable to attachments by each type of communications service provider under [Section 224]." § 62-350(c). As the Court of Appeals stated, § 62-350 "endorses regulatory intervention to promote 'just and reasonable rates.'" *Town of Landis*, 747 S.E.2d at 616. While the Court may consider and apply other evidence presented by the parties to determine whether Plaintiff's rates are just and reasonable, the Court looks first to the FCC's methods for setting maximum just and reasonable pole attachment rates, given the express instruction for the Court to consider the FCC approach outlined in Section 224.

{52} The FCC has two rate methodologies, the FCC Cable Rate set forth in 47 U.S.C. § 224(d) and the FCC Telecom Rate set forth in 47 U.S.C. § 224(e). The FCC revised the FCC Telecom Rate formula in 2011 to yield a maximum rate that is essentially the same as the maximum rate produced by the FCC Cable Rate formula. Neither Defendants nor Plaintiff support using the FCC Telecom Rate formula in this case.

{53} The FCC Cable Rate formula is based on economic "cost causation principles, meaning that the cost [included in the rate] must be demonstrated to have some cost linkage to the thing that's really being . . . used, which is [an] attachment to a pole." (Trial Tr. 612.) In this manner, the FCC Cable Rate formula calculates the maximum just and reasonable rate that a pole owner may charge based on an appropriately allocated share of the actual, documented costs of owning and maintaining a pole.

{54} The evidence presented in this case demonstrated that the FCC Cable Rate formula's allocation method, used to determine what percentage of the fully allocated costs to assign to the attaching party, provides an economically justified means of reasonably allocating costs. It assigns to the attaching party a percentage of the costs of the entire pole equal to the proportion of the average pole's usable space occupied by the attacher. For example, if the average pole on Plaintiff's system has 13.5 feet of usable space and Defendants' attachment uses one foot of that space, the FCC method would assign 1/13.5 or 7.4 percent, of the annual costs of the entire pole to Defendants.

{55} Plaintiff argues that the FCC Cable Rate formula creates a subsidy flowing from the pole owner to the attacher. However, far from providing any subsidy to communications providers, the FCC Cable Rate formula actually leaves the utility and its customers better off than they would be if no attachments were made to their poles. The cable attacher pays most of the incremental "but for" costs of attachment up front, as well as its share of the fully allocated costs of pole ownership that necessarily would exist even absent its attachment.

{56} Furthermore, under the terms of the license agreement, Defendants are only allowed to use excess – or surplus – pole space. That is, Defendants may only use space not being used by Plaintiff or a joint user. And, if Plaintiff reclaims space that Defendants occupy, Defendants must either remove their attachments or create additional pole space for its attachment and any needed safety space (including paying for the purchase and installation of a new, taller pole). When Defendants pay to create surplus space where it does not already exist, Plaintiff benefits from receiving a taller, stronger pole that enhances Plaintiff's network, and Defendants remain obligated to pay annual rent to maintain an attachment to that pole.

{57} Applying the FCC pole attachment rate methodology also promotes uniformity in pole attachment rates across the state. The FCC formula already applies to IOUs in North Carolina. Although IOUs' cost structure may differ from EMCs like Plaintiff, Defendants' expert explained that the FCC formula accommodates differences in cost between utilities "because costs are input from [the specific utility's] books." (Trial Tr. 649–650.) This makes the FCC formula "applicable to all manner[] of utilities," regardless of differences in costs, the number of attaching entities, or other variables.

{58} Even NRECA, the national electric cooperative trade association to which Plaintiff and its experts looked for guidance, states that rates established according to the FCC rules are "unimpeachable." (Joint Ex. 27 at 7542.) NRECA explains that "[t]he [FCC] rate formulas are sanctioned by the U.S. Congress, have been adopted by most of the states that regulate pole attachments and are the most widely accepted methodologies for calculating pole attachment rates." *Id.*

{59} The Court thus finds that it is appropriate to consider the rates yielded by the FCC Cable Rate formula in determining whether Plaintiff's rates are just and reasonable. Not only is the Court directed to do so by § 62-350, but, by applying the facts presented in this case to an analytical structure that is well-understood, widely used, and judicially sanctioned, the Court is assured that it is not exceeding its judicial function. Moreover, the Court expects that reliance on established FCC

precedent will, as the General Assembly intended, provide helpful guidance to parties involved in future negotiations over just and reasonable pole attachment rates, terms, and conditions.[6]

1.

RATES UNDER FCC CABLE RATE FORMULA

{60}    Defendants' expert Patricia Kravtin ("Kravtin") was the only witness to provide evidence of Plaintiff's maximum just and reasonable rates under the FCC Cable Rate formula.  The Court finds that her calculations are faithful to the FCC Cable Rate formula, and, in this case, derive the following maximum just and reasonable pole rates for each year in question based on Plaintiff's costs:

> 2010: $2.68
> 2011: $2.56
> 2012: $2.57
> 2013: $2.64

(Def. Ex.139; *see also* Joint Exs. 5, 126–31.)

{61}    To calculate these amounts, Kravtin used FCC methodology to (i) determine the net cost of an average utility pole; (ii) multiply that cost by carrying charge factors to determine the utility's annual cost of owning and maintaining an average pole; and (iii) then allocate a portion of that annual cost to the third-party attacher.

{62}    Plaintiff's only challenges to Kravtin's calculations under the FCC Cable Rate formula relate to the values of the variables she used.  First, Plaintiff's expert Gregory Booth ("Booth") proposed higher inputs for the net bare cost of a pole than are yielded by the FCC methodology.  Kravtin, therefore, proposed alternative calculations using Booth's proposed inputs for the net bare pole cost, deriving the following maximum just and reasonable pole rates for each year in question:

> 2010: $3.63
> 2011: $3.51
> 2012: $3.51

---

[6] The Court emphasizes that this finding is based on the facts presented at trial in this case, and does not limit the Court from considering other methods of proving just and reasonable rates in future cases that may be brought under § 62-350.

2013: $3.55

(Trial Tr. 653–56; *see also* Def. Ex. 139; Joint Exs. 127A, 128A, 129B, and 130A.)

{63} Plaintiff further challenged Kravtin's use of the presumptive average of 13.5 feet of usable space rather than an average usable space derived from Plaintiff's actual data. Kravtin testified that, where Plaintiff's actual data was available, she used Plaintiff's information in her calculations rather than presumptive limits outlined by the FCC. However, she further admitted that she used the FCC presumptive limit of 13.5 feet of usable space when deriving the space allocation factor. The Court finds Kravtin's use of the presumptive limit, in this instance, reasonable given the lack of complete data from Plaintiff on the average usable space on an average pole in its system.[7]

{64} The rates calculated by Kravtin are somewhat lower than the maximum just and reasonable rates charged by IOUs and incumbent local telephone companies in North Carolina. The average pole attachment rates that Defendants paid to North Carolina IOUs under the FCC Cable Rate over the same time period ranged from $5.91 to $6.06. The highest such rates in each year were: $6.79 in 2010, $6.40 in 2011, $7.67 in 2012, and $7.70 in 2013. (Def. Ex. 132.) The average pole attachment rates that Defendants paid to an incumbent local telephone company in North Carolina over that period ranged from $3.28 to $5.03, and the highest rate was $6.25. (Def. Ex. 133.) Regardless, the disparity between the FCC

---

[7] Despite Plaintiff's contentions, it appears from the record that Plaintiff's proffered amount of average usable space (10.83 feet) is similarly based on presumption rather than actual data. In calculating the average usable space, Plaintiff's expert relied solely on Plaintiff's standard 40-foot pole for his calculations, even though the property records indicate an average pole height of roughly 37.5 feet. Then, using the 40-foot pole as the presumed height, he derived an average usable space of 10.83 feet and an average unusable space of 29.17 feet. However, to do this, he did not appear to use Plaintiff's actual data. Rather, he assumed that each pole has only one third-party attacher and that Plaintiff only uses an average of 6.5 feet for its facilities. Neither of these assumptions is clearly borne out in the evidence of Plaintiff's actual data presented at trial. Nonetheless, he relied on these assumptions, and added Plaintiff's 6.5 feet of space, the third-party attacher's one foot of space, and the 40 inches of safety space to get 10.83 feet of usable space. He then subtracted this number from the total 40 feet available on the pole to calculate an average unusable space of 29.17 feet. Neither of these numbers indicate a true average based on Plaintiff's actual data. And, the Court finds Defendants' proffered amount of presumptive usable space more credible. Thus, in the absence of real data to refute the presumed 13.5 feet of usable space, the Court finds Kravtin's calculations to be a sound method for assessing just and reasonable rates.

Cable rates calculated by Kravtin and the IOU rates, on the one hand, and the rates charged by Plaintiff, on the other hand, does not undercut the reasonableness of the former or justify the latter.

{65}   The Court finds that Plaintiff's pole attachment rates, which ranged from $15.50 to $19.65 from 2010 through 2013, are far in excess of the maximum just and reasonable pole attachment rates calculated under the FCC Cable Rate formula, even using Plaintiff's own expert's net bare pole cost calculations.  Plaintiff's rates also far exceed the maximum just and reasonable pole attachment rates charged by other pole owners in North Carolina, including IOUs and incumbent local telephone companies whose rates are regulated.

2.

PLAINTIFF'S EVIDENCE DOES NOT SUPPORT ITS RATES

{66}   Plaintiff and its experts presented three different rate methodologies to prove that its rates were just and reasonable.  Each rate methodology purports to be grounded in part on the FCC rate methodology.  Specifically, Plaintiff appears to agree with the same general formula: (i) determine the net cost of an average utility pole; (ii) multiply that cost by carrying charge factors to determine the utility's annual cost of owning and maintaining an average pole; and (iii) then allocate a portion of that annual cost to the third-party attacher.  However, Plaintiff and its experts incorporate various modifications to the variables.  Plaintiff's proposed methodologies conflict with each other, and Plaintiff did not present credible evidence to support these inconsistent approaches.

a.

PLAINTIFF'S ORIGINAL METHODOLOGY

{67}   As Plaintiff increased its rates from 2005 through 2013, Haire, its system engineer, performed different rate calculations in an effort to justify its new rates. Haire testified that Plaintiff was willing to use the FCC Cable Rate as a guide as long as it produced a sufficient maximum rate to justify his desired rate increase. (Trial Tr. 231–33.)  But when Plaintiff could no longer use the FCC's methodology to justify its higher rates, Haire instead began using non-FCC formulas, including the

Telecom Plus formula supplied by NRECA. The Telecom Plus formula has not been adopted by any court or administrative agency as a means of establishing a maximum just and reasonable rate.[8]

{68} Both the FCC Cable Rate formula and NRECA's Telecom Plus formula use identical calculations to derive the annual net cost of owning and maintaining an average pole. (Joint Ex. 27; Trial Tr. 253.) The two formulas differ in how they allocate those costs. Rather than allocating the costs of the entire pole in the proportion that the attaching party uses the usable space, as in the FCC Cable Rate formula, the Telecom Plus formula allocates the usable space in the same manner as the FCC Cable Rate formula, but allocates the unusable space equally among all of the attaching parties.

{69} The Court finds that the evidence does not justify using the Telecom Plus formula under § 62-350 in this case. The additional rights and usable space afforded to Plaintiff and the joint users warrant allocating a proportional share of the cost of the unusable space to them, rather than an amount equal to the cost allocated to third-party attachers like Defendants. Plaintiff makes much greater use of the pole than any other party, and Bell South uses more space than Defendants. Moreover, under Plaintiff's joint use arrangement with Bell South, Plaintiff agreed to reserve two feet of space for Bell South and to construct taller, stronger poles if there was insufficient space. On the other hand, Defendants only

---

[8] Nor is the Telecom Plus formula supported by the decision of the Superior Court of Washington for Pacific County in *Public Util. Dist. No. 2 of Pacific County v. Comcast of Washington IV, Inc.*, No. 07-2-004484-1 (Wash. Super. Dec. 12, 2011). There, the court interpreted Section 54.04.045 of the Revised Code of Washington, which is materially different from § 62-350 and sets forth a unique procedure for calculating a just and reasonable rate for attachments to poles owned by public utility districts ("PUDs"). The Washington statute instructs the court to derive a rate that is the average of two cost-based calculations specified in the statute. Accordingly, the parties' dispute focused primarily on how to interpret the statute's cost-based formulas: the attachers argued that the statute set the rate as the average of the maximum rates under the FCC Cable and Telecom Rate formulas, while the PUD argued that it set the rate as the average of the maximum rates under the FCC Telecom Rate formula and a formula used by the American Public Power Association ("APPA") (which is similar to NRECA's Telecom Plus formula). After finding that it was required to review the PUD's interpretation of the statute under a highly deferential "arbitrary and capricious" standard, and noting that the legislative history of the statute discussed the APPA formula, the court affirmed the PUD's interpretation.

have the right to use surplus space on the pole, and must pay to install a taller, stronger pole if necessary to make surplus space for its attachment and sufficient safety space.

{70} In enacting Section 224, Congress relied on an analogy of an apartment house with 10 floors and common areas, such as the lobby, elevators, and a garage. In its analogy, a family renting one of the floors would expect to pay one tenth of the costs of the common areas, even if the landlord had reserved use of the other nine floors. Drawing from this analogy, the Telecom Plus formula would unreasonably require a family renting a single floor in a 10-floor apartment house to pay one-half of all the common costs of the building, even though the owner of the building occupies the other nine floors and retains additional rights to the building itself.

{71} Even if the Telecom Plus method was a defensible method for calculating a reasonable rate, Haire made critical errors in applying it. Haire admitted that he miscalculated the carrying charge element. He failed to divide maintenance expenses by the net investment in overhead conductors and service lines, as called for by the NRECA formula. He also used a "default" rate of return rather than Plaintiff's actual rate of return, even though he had no basis to use the default and the default was higher than the rate of return used by Plaintiff's experts. Had he used correct inputs for the maintenance and rate of return elements in the carrying charge, Haire's calculations would have produced a rate nearly $8.00 lower than the Telecom Plus rate he calculated for 2012, and nearly $3.00 lower than the rate Plaintiff charged TWEAN that year. (Trial Tr. 241, 257–58.)

{72} Further, Haire did not divide the cost of unusable space evenly among all attachers, as called for by the Telecom Plus formula. Under the Telecom Plus formula, Defendants should never pay more than 50 percent of the cost of unusable space, and then only if it is the only other entity on the pole. If the same pole included Bell South or another third party, Defendants would be required to pay no more than 33 percent of the costs (or 25 percent if there is a fourth entity on the pole). However, Haire divided the cost of unusable space by only 1.45 attaching parties, the average number of entities attached to Plaintiff's poles. This division

allocated 69 percent of the cost of the unusable space to Defendants on every pole for which it pays rent. The problem with Haire's calculation is that, by definition, if Defendants are on the pole, that pole has at least two attaching parties – Plaintiff and Defendants.

{73}  The Court might have been swayed by Plaintiff's arguments regarding the equal allocation of the unusable space, if the attachers shared equal rights to the pole and the cost was indeed equally allocated (*i.e.*, based on the average number of attaching entities on those poles with attachments other than Plaintiff). However, the record does not support such findings. Therefore, the Court finds that Haire's calculations are flawed and do not support the rates that Plaintiff charged from 2010 through 2013, even under the NRECA Telecom Plus formula purportedly used.

b.

PLAINTIFF'S EXPERT JUDY BEACHAM

{74}  Plaintiff's first expert, Judy Beacham ("Beacham"), had never performed a pole attachment rate analysis or worked with pole attachments prior to this case. Beacham's rate methodology relied primarily on the Electric Utility Cost Allocation Manual of the National Association of Regulatory Utility Commissioners, a "position paper" prepared by a lawyer on behalf of a number of IOUs and presented to the FCC in 1996. (Trial Tr. 275–76, 314–22; Def. Ex. 42.) Beacham followed the basic outlines of the Telecom Plus rate methodology except that she: (i) added to the cost of a bare utility pole by adding in the cost of anchors, guys, grounds, and lightening arresters; (ii) added to the expenses included in the carrying charge, including a category called "operations related expenses" that is not found in the FCC or Telecom Plus formulas; and (iii) allocated the pole cost in the same way as the NRECA Telecom Plus formula, except she made adjustments to the amount of unusable space, consistent with the recommendations of the position paper. The Court finds that these modifications are not adequately supported in the record.

{75}  Further, even if Beacham's methodology were credible, she would still be missing a critical input to the Telecom Plus formula's space allocation factor. Beacham's space allocation approach required data on the number of attaching

entities on an average "joint-use" pole (*i.e.*, a pole that is used for attachments by third parties), data which Plaintiff does not have. Beacham admitted that her methodology would not justify Plaintiff's 2012 rate if the average pole to which Defendants attached had more than 2.4 attaching entities. (Trial Tr. 335.) Beacham explained that if a third entity – such as Bell South – was attached to 40 percent or more of the poles to which Defendants were attached, then her methodology would not support Plaintiff's rate of $19.65 for 2012. Because Plaintiff introduced no evidence as to how many other entities are on the average pole to which Defendants are attached, Beacham's rate calculations appear incomplete, and thus, the Court will not rely on her testimony to find Plaintiff's rates just and reasonable.

c.

PLAINTIFF'S EXPERT GREGORY BOOTH

{76} Plaintiff's second expert, Booth, performed a rate analysis as well as a "Times Interest Earned Ratio" or "TIER" analysis in an effort to support Plaintiff's rates.

{77} Booth's rate analysis relied on the basic structure of the Telecom Plus formula, except that, unlike Haire, Beacham, or NRECA (or the FCC), he assigned to Defendants the entire 40-inch communications workers safety space that the NESC requires between communications lines and electrical conductors. (Trial Tr. 374, 384–85.) This means that while the FCC, Haire, Beacham, and NRECA treat a communications attachment as occupying one foot of space, Booth treated each communications attachment as occupying four feet and four inches of pole space, significantly increasing the rate.

{78} The evidence at trial showed that Plaintiff uses and generates revenue from the safety space by installing streetlights in that space on at least some of its poles. (Trial Tr. 267.) Because Plaintiff uses the safety space for streetlights and other facilities, and can require Defendants to remove their attachments if Plaintiff needs to use the safety space for other types of facilities, the Court finds that there is no basis for allocating the safety space entirely to the attacher, as Booth did. It

would be unjust and unreasonable to require Defendants to pay for the safety space as a component of its annual pole attachment rate.

{79} Booth's rate calculation also uses a flawed unusable space allocation methodology. While Booth stated that the costs of the unusable space should be paid for evenly by each party that occupies the pole, he made the same mistake as Haire. Like Haire, Booth divided the unusable space by 1.45, rather than recognizing that, by definition, each pole to which Defendants are attached must have at least two parties attached to it (Defendants and Plaintiff, at a minimum). The mathematical result of Booth's space allocation is the same as Haire's – he assigns 69 percent of the cost of the unusable space to Defendants, even though, according to his theory, the unusable space is used equally by Defendants, Plaintiff, and any joint user that may be on the pole. He also assigns 61 percent of the entire average annual pole cost that he calculates to Defendants. (Trial Tr. 483–84.) In other words, despite Plaintiff's (and Bell South's) greater use of the pole and more valuable rights, Booth's rate methodology assigns a significantly greater portion of the pole costs (over 60 percent) to Defendants than to any other party on the pole, including the pole owner.

{80} Booth attempted to defend his space allocation methodology by asserting that the average pole to which Defendants attach is more expensive for Plaintiff. Yet Plaintiff presented no evidence to support this assumption. Indeed, Plaintiff does not have any data about how many (or which) poles on its system have one or more third-party attachments.

{81} Based on the evidence in this case, the Court finds that Booth's rate analysis does not produce just and reasonable rates, and thus, cannot support the reasonableness of Plaintiff's rates from 2010 to 2013.

{82} Booth also performed a TIER analysis, which is a financial ratio used to assess the financial stability of EMCs. His TIER analysis sought to compare the margin and TIER that Plaintiff would achieve both with and without third-party communications attachments. Booth attempted to demonstrate that, even at Plaintiff's current pole rates, Plaintiff is subsidizing pole attachment licensees like

Defendants. First, he assumed that Plaintiff added five feet of space to every pole in its system solely to provide pole attachment space for Defendants and other communications licensees. Then, he attempted to determine the annual cost of that extra five feet of space by comparing what he understood to be the costs for a 35-foot pole to the costs for a 40-foot pole. (Trial Tr. 410–11.)

{83} However, Booth's underlying assumption – that Plaintiff builds 40-foot poles solely because attachers like Defendants might one day want to attach to those poles – is not supported by the evidence. The evidence shows that, for more than 25 years, Plaintiff has used a 40-foot, class five pole as its standard pole, regardless of the presence of communications entities. (Trial Tr. 63, 113, 119–20.) Plaintiff's witnesses further testified that Plaintiff uses the standard 40-foot pole to accommodate other electric utilities, who do not pay for their attachments, and Bell South, as required by its 1996 agreement. None of Plaintiff's witnesses testified that Plaintiff installs taller, stronger poles solely for communications attachers like Defendants. To the contrary, the evidence revealed that Defendants, not Plaintiff, must pay to install and make-ready any new, larger pole needed to create additional space for its attachment. Thus, if a 35-foot pole does not have one foot of surplus space for Defendants' attachment, Defendants must incur the additional cost of five feet of pole space by paying for a 40-foot pole, including installation. And, Plaintiff takes ownership of the improvement, while Defendants continue to pay rent to attach to the new pole. Upon weighing these facts, the Court finds Booth's conclusions regarding his TIER analysis faulty, and does not rely on his testimony to find Plaintiff's rates just and reasonable.

d.

OTHER ATTACHERS' ACCEPTANCE OF RATES

{84} The Court also rejects Plaintiff's argument that its rates for 2010 through 2013 are reasonable and binding on Defendants because other communications service providers agreed to pay those rates. Plaintiff presented no credible evidence indicating that its rates are reasonable merely because other licensees paid them. The fact that other communications service providers have agreed to pay its pole

rates does not, *ipso facto*, make those rates reasonable.  Moreover, the evidence reflects that at least one of the other entities that paid those rates did so because of Plaintiff's refusal to lower its rates unless ordered to do so, and the reluctance or inability of that communications service provider to litigate the issue.  (Trial Tr. 593–97.)

3.

PLAINTIFF'S RATES FROM 2010 TO 2013 ARE NOT JUST AND REASONABLE

{85}    Because Plaintiff's pole attachment rates from 2010 through 2013 greatly exceed the maximum just and reasonable pole attachment rates calculated under the FCC Cable Rate formula, and are not otherwise supported by the evidence and methodologies put forth by Plaintiff and its experts, the Court finds that Plaintiff's rates for 2010 through 2013 are not just and reasonable.

V.

CONCLUSIONS OF LAW

{86}    This Court has jurisdiction under § 62-350 and North Carolina's Declaratory Judgment Act, N.C. Gen. Stat. §§ 1-253 to 1-257, to hear and determine the parties' claims for relief regarding the reasonableness of Plaintiff's pole attachment rates and methods.

{87}    The ultimate disposition of the claims in this action present questions of statutory interpretation.  "The primary rule of construction of a statute is to ascertain the intent of the legislature and to carry out such intention to the fullest extent."  *Applewood Props., LLC v. New South Props., LLC*, 366 N.C. 518, 522, 742 S.E.2d 776, 779 (2013) (quoting *Dickson v. Rucho*, 366 N.C. 332, 339, 737 S.E.2d 362, 368 (2013)).  To discern the intent of the legislature, the Court looks first to the plain language of the statute.  *Lenox, Inc. v. Tolson*, 353 N.C. 659, 664, 548 S.E.2d 513, 517 (2001).  "If the language of a statute is clear, the court must implement the statute according to the plain meaning of its terms so long as it is reasonable to do so."  *Id.* (citation omitted).

{88}    Pursuant to § 62-350, only municipalities, membership corporations organized under Chapter 117 of the General Statutes, and communications service

providers may bring claims for relief under the statute. Having found that Plaintiff is a membership corporation organized under Chapter 117 of the General Statutes; TWEAN was a communications service provider as contemplated under § 62-350 prior to 2013; and TWC Southeast became a communications service provider as contemplated under § 62-350 in October 2012, the Court concludes that the parties have standing to pursue the claims. Specifically, TWEAN has standing to pursue the claims regarding Plaintiff's rates in 2010, 2011, and 2012, and TWC Southeast has standing to pursue the claims regarding Plaintiff's rate for 2013.

{89} Also, given that TWEAN submitted a request to negotiate Plaintiff's rates and the parties thereafter failed to reach an agreement within 90 days despite good faith efforts to negotiate, the Court concludes that the parties' claims are properly before it for determination under § 62-350, and are not otherwise precluded or barred by any affirmative defenses raised by the parties.

{90} To determine whether the rates adopted by Plaintiff are just and reasonable, § 62-350 directs the Court to consider "such other factors or evidence that may be presented by a party, including without limitation the rules and regulations applicable to attachments by each type of communications service provider under [Section 224] . . . ." § 62-350(c). Therefore, the Court must consider the FCC rules and regulations under Section 224, including the maximum rates deemed just and reasonable under the FCC Cable Rate formula. However, § 62-350 clearly does not limit the Court's consideration to only the rules and regulations applicable under Section 224. The Court concludes that it may consider and weigh other methods to review rates under § 62-350. Nonetheless, on the record before the Court in this case, the FCC Cable Rate formula offered the most credible basis for measuring the reasonableness of Plaintiff's rates.

{91} Furthermore, the Court disagrees with Plaintiff's interpretation of the "nondiscriminatory" language in § 62-350 to mean that rates are deemed reasonable because other third-party attachers in the same class as Defendants accepted Plaintiff's rates. The language and structure of § 62-350 indicate that Plaintiff must negotiate with each communications service provider that requests access to

its poles.  *See* § 62-350(b).  The statute sets timelines for the negotiations, procedures for triggering judicial review in the event the parties reach an impasse, and guidelines for the Court to follow in resolving a complaint.  § 62-350(c).  These provisions would be meaningless if Plaintiff could dictate the rates and terms of attachment for every communications service provider once it reached an agreement with a single one.  Had the General Assembly intended § 62-350 to insulate "class-based" rates, terms, and conditions from review in individual cases, it could have said so expressly, but it did not.  While other third-party attachers' acceptance of Plaintiff's rates may be weighed as evidence, the Court will not foreclose review under § 62-350 because certain similarly-situated entities chose to accept Plaintiff's rates rather than litigate.

{92}    Related to the reasonableness of Plaintiff's rates, Defendants also allege that Plaintiff's method of unilaterally increasing its rate without negotiation violated § 62-350.  To address this issue, the Court again looks to the plain language of § 62-350.  Under the statute, Plaintiff must allow communications service providers to attach to its poles "at just, reasonable, and nondiscriminatory rates, terms, and conditions *adopted pursuant to negotiated or adjudicated agreements*." § 62-350(a) (emphasis added).  Subsections (b) and (c) of the statute further direct Plaintiff to negotiate with the communications service provider upon a request, and provide certain mechanisms for resolving disputes arising out of these negotiations. The meaning of the statute is clear.  Plaintiff cannot subject a communications service provider to a rate without first negotiating and subsequently adopting a rate or litigating disputes.  Although § 62-350 in no way bars the parties from reaching an agreement through negotiation that may contemplate annual rate increases, the Court concludes that the statute cannot be construed to allow Plaintiff to do so without first negotiating with Defendants.  Therefore, the Court concludes that Plaintiff's unilateral rate increases for the years in dispute violated § 62-350.

{93}    Finally, pursuant to § 62-350, the Court must resolve the dispute between the parties to determine whether the rate is just and reasonable, and then "apply any new rate adopted as a result of the action retroactively to the date immediately

following the expiration of the 90-day negotiating period or initiation of the lawsuit, whichever is earlier." § 62-350(c). Having found Plaintiff's rates for the years 2010 through 2013 unjust and unreasonable based on the evidence presented in this case, the Court concludes that the parties must negotiate and adopt new rates for the years 2010 through 2013 that are consistent with the reasoning in this Order.[9] Thereafter, the rates adopted shall be applied retroactively to the date immediately following the expiration of the 90-day negotiating period for each year or the initiation of this lawsuit, whichever is earlier. As such, from the date the rates are applied for the years 2010 through 2012, Plaintiff must reimburse TWEAN for any amounts overpaid. And, TWC Southeast must pay Plaintiff the amount owed based on the new rate adopted for 2013.

## VI.
## CONCLUSION

{94} For the above stated reasons, the Court ORDERS and DECLARES as follows:

a. Plaintiff's per attachment rates for 2010 through 2013 are unjust and unreasonable, in violation of § 62-350;

b. Plaintiff lacked authority to impose unjust and unreasonable pole attachment rate increases on Defendants for the years 2010 through 2013;

c. Plaintiff's efforts to increase Defendants' rates unilaterally without negotiation for the years 2010 through 2013 violated § 62-350;

d. Within 90 days of the entry of this Order, the parties must adopt new rates for 2010 through 2013 in accordance with the reasoning outlined in this Order;

---

[9] Although Defendants sought damages in the event that the Court found Plaintiff's rates unjust and unreasonable, the Court concludes that, in assessing damages, it would be, in effect, setting a new rate. This precise action prompted the Court's initial concerns about exceeding its judicial role and stepping into a legislative role, which it is not inclined nor allowed to do. The parties alleviated these concerns by assuring the Court that it need only determine whether the rate adopted by Plaintiff was just and reasonable. Having made this determination, the Court leaves the issue of what rate shall be applied going forward for the years in dispute up to the parties. Once a rate has been adopted as a result of this action, it shall be applied retroactively, pursuant to § 62-350, such that Defendants will receive any amount initially overpaid.

e. Upon adopting new rates for each of the disputed years, the new rate shall be applied retroactively to the date immediately following the expiration of the initial 90-day negotiating period for each year or the initiation of this lawsuit, whichever is earlier;

f. Within 30 days after the parties agree to a new rate for each disputed year, Plaintiff must reimburse Defendants for any amounts overpaid, and/or Defendants must pay Plaintiff any amounts owed under the new rate; and

g. The Court retains jurisdiction to enforce the provisions of this Order, and to grant such further and supplemental relief as may be required.

SO ORDERED, this the 22nd day of May, 2014.