Time Warner Entm't Advance/Newhouse P'ship v. Town of Landis, N.C., 2014 NCBC 25.

STATE OF NORTH CAROLINA

ROWAN COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
10 CVS 1172

TIME WARNER ENTERTAINMENT
ADVANCE/NEWHOUSE PARTNERSHIP,

Plaintiff,

v.

TOWN OF LANDIS, NORTH CAROLINA,

Defendant.

ORDER AND OPINION

*Brooks, Pierce, McLendon, Humphrey & Leonard, LLP by Reid L. Phillips; Hogan Lovells, LLP by Gardner F. Gillespie and Paul A. Werner, III for Plaintiff.*

*Poyner Spruill, LLP by David M. Barnes and Andrew H. Erteschik for Defendant.*

*The Bussian Law Firm, PLLC by John A. Bussian for the North Carolina Cable Telecommunications Association, Amicus Curiae.*

*Nelson Mullins Riley & Scarborough, LLP by Joseph W. Eason, Christopher J. Blake, and Phillip A. Harris for the North Carolina Association of Electric Cooperatives, Amicus Curiae.*

*ElectriCities of North Carolina, Inc. by W. Mark Griffith, Amicus Curiae.*

Murphy, Judge.

{1}     THIS MATTER came before the Court for trial without a jury on July 18, 2011, to resolve claims asserted by Plaintiff Time Warner Entertainment Advance/Newhouse Partnership ("Plaintiff") against Defendant Town of Landis ("Defendant") pursuant to N.C. Gen. Stat. section 62-350 ("§ 62-350"). The various claims relate to the rates, terms, and conditions Defendant seeks to impose on Plaintiff to attach its communications infrastructure to Defendant's utility poles. After the bench trial concluded, the Court requested additional briefing on certain constitutional questions related to § 62-350. Having considered the evidence presented by the parties at trial, the parties' pre- and post-trial briefs, the briefings

of amici, and the arguments and contentions of counsel, the Court finds, concludes, and orders as follows:

I.

PROCEDURAL HISTORY

{2}    On April 19, 2010, Plaintiff filed its Verified Complaint to resolve a dispute with Defendant concerning the rates, terms, and conditions of Plaintiff's attachment of its telecommunications transmission cables to utility poles owned by Defendant.  Specifically, Plaintiff alleged that: (1) Defendant refused to negotiate in good faith the terms of a new pole attachment agreement between the parties; (2) Defendant's proposed attachment terms violate § 62-350's nondiscrimination requirement; and (3) the specific terms of Defendant's proposed new attachment agreement are "unjust and unreasonable."

{3}    Pursuant to § 62-350(c), Plaintiff contests three terms in Defendant's proposed new attachment agreement, and asks the Court to determine whether: (a) Defendant's proposed rental rate of $18.00 per attachment is an unjust and unreasonable rate; (b) Defendant's proposal to charge Plaintiff the $18.00 rental rate separately for "any one cable that is physically attached to a pole by means of a through bolt" is unjust and unreasonable; and (c) Defendant's proposed $15.00-per-day fine for safety violations caused by Plaintiff's non-compliant pole attachments existing after Defendant provides 30-days' notice of such violations is unjust and unreasonable.

{4}    The case was designated as a mandatory complex business case on April 21, 2010, and assigned to the Court on April 22, 2010.

{5}    On June 4, 2010, Defendant filed its Answer, praying, in part, that the Court declare Defendant's proposed rates, terms, and conditions reasonable.

{6}    On June 22, 2010, the North Carolina Association of Electric Cooperatives ("NCAEC") moved to intervene in this action pursuant to Rule 24 of the North Carolina Rules of Civil Procedure.  The Court denied NCAEC's Motion to Intervene on August 17, 2010, instead permitting NCAEC to submit briefs as *amicus curiae*.

{7}     ElectriCities of North Carolina, Inc. ("ElectriCities") moved for permission to participate in the case as *amicus curiae* on August 25, 2010, which the Court granted on September 21, 2010.

{8}     The North Carolina Cable Telecommunications Association ("NCCTA") moved for permission to participate in the case as *amicus curiae* on January 26, 2011, which the Court granted on February 15, 2011.

{9}     On December 20, 2010, Defendant filed its Motion for Partial Summary Judgment as to Plaintiff's claims for failure to negotiate and for discrimination. After briefing and oral argument, the Court granted Defendant's Motion for Partial Summary Judgment as to Plaintiff's claim for failure to negotiate, and denied the Motion as to the discrimination claim. *See Time Warner Entm't Advance/Newhouse P'ship v. Town of Landis*, 2011 NCBC 19 ¶ 66 (N.C. Super. Ct. June 30, 2011), http://www.ncbusinesscourt.net/ opinions/2011_NCBC _19.pdf.

{10}     From July 18 to July 21, 2011, the Court conducted a bench trial on the remaining claims.  At the close of all evidence, Plaintiff attempted to withdraw its discrimination claim, purporting to leave only the disputed terms of the proposed attachment agreement for the Court to resolve.

{11}     On June 19, 2012, the Court notified the parties of the Court's concerns about two questions of law: namely, the justiciability of the remaining claims, and the constitutionality of § 62-350 with respect to certain requirements it imposed upon the Court.  The parties, and *amici curiae* NCCTA and NCAEC, briefed the Court on these two matters, and the Court conducted a hearing on July 17, 2012.

{12}     On September 21, 2012, the Court entered its Order and Opinion dismissing the remaining claims for lack of a justiciable controversy to confer subject matter jurisdiction on the Court. *See Time Warner Entm't Advance/Newhouse P'ship v. Town of Landis*, 2012 NCBC 48 (N.C. Super. Ct. Sept. 21, 2012), http://www.ncbusinesscourt.net/opinions/2012_NCBC_48.pdf.  Thereafter, Plaintiff timely appealed the Court's Order.

{13}     By its Order dated August 6, 2013, the North Carolina Court of Appeals reversed the Court's decision, concluding that the Court does have subject matter

jurisdiction to resolve the claims. *See Time Warner Entm't Advance/Newhouse P'ship v. Town of Landis*, 747 S.E.2d 610 (2013).

{14} Upon remand, the Court allowed supplemental briefing to address the remaining question regarding the constitutionality of § 62-350 and additional arguments related to final judgment.

II.

POLE ATTACHMENT REGULATION UNDER § 62-350[1]

{15} As enacted in July 2009, § 62-350 mandates that municipalities and membership corporations organized under Chapter 117 of the North Carolina General Statutes "shall allow any communications service provider to utilize [their] poles, ducts, and conduits at just, reasonable, and nondiscriminatory rates, terms, and conditions adopted pursuant to negotiated or adjudicated agreements." N.C. GEN. STAT. § 62-350(a) (2013). Included in the definition of "communications service provider" are those that provide "cable service over a cable system as those terms are defined in Article 42 of Chapter 66 of the General Statutes." § 62-350(e).

{16} The statute further provides that:

> Following receipt of a request from a communications service provider, a municipality or membership corporation shall negotiate concerning the rates, terms, and conditions for use of or attachment to the poles, ducts, or conduits that it owns or controls. Following a request from a party to an existing agreement made pursuant to the terms of the agreement or made within 120 days prior to or following the end of the term of the agreement, the communications service provider and the municipality or membership corporation which is a party to that agreement shall negotiate concerning the rates, terms, and conditions for the continued use of or attachment to the poles, ducts, or conduits owned or controlled by one of the parties to the agreement. . . . Upon request, a party shall state in writing its objections to any proposed rate, terms, and conditions of the other party.

---

[1] In a similar case brought under § 62-350, the Court provided a full recitation of the background of pole attachment regulation leading up to the enactment of § 62-350. *Rutherford Elec. Membership Corp. v. Time Warner Entm't Advance/Newhouse P'ship*, 2014 NCBC 20, ¶¶ 2–11 (N.C. Super. Ct. May 22, 2014), http://www.ncbusinesscourt.net/opinions/2014_NCBC_20.pdf (order and opinion on final judgment).

N.C. GEN. STAT. § 62-350(b) (2014).[2]

{17}    However, if "the parties are unable to reach an agreement within 90 days . . . or if either party believes in good faith that an impasse has been reached . . ., either party may bring an action in Business Court . . ., and the Business Court shall have exclusive jurisdiction over such actions." § 62-350(c).  In that event, the statute directs the Business Court to do the following:

> resolve any dispute identified in the pleadings consistent with the public interest and necessity so as to derive just and reasonable rates, terms, and conditions, taking into consideration and applying such other factors or evidence that may be presented by a party, including without limitation the rules and regulations applicable to attachments by each type of communications service provider under section 224 of the Communications Act of 1934, as amended, and [] apply any new rate adopted as a result of the action retroactively to the date immediately following the expiration of the 90-day negotiating period or initiation of the lawsuit, whichever is earlier.  If the new rate is for the continuation of an existing agreement, the new rate shall apply retroactively to the date immediately following the end of the existing agreement.

§ 62-350(c).

{18}    The North Carolina Court of Appeals interpreted "§ 62-350 to establish several judicially-enforceable statutory rights." *Time Warner Entm't Advance/Newhouse P'ship v. Town of Landis*, 747 S.E.2d 610, 616 (2013).  "For instance, . . . § 62-350 creates a statutory right for both communications service providers and municipalities to establish 'just, reasonable, and nondiscriminatory' pole attachment rates within 90 days of a request to negotiate." *Id.* (quoting § 62-350(c)).  The court also held that "the statute expressly creates a private cause of action to enforce these rights." *Id.* (citation omitted).

{19}    Prior to commencement of an action, the attaching entity must pay any undisputed fees owed to a municipal or cooperative pole owner under an existing agreement, and the Court "may resolve any existing disputes regarding fees alleged

---

[2] "In granting a request under this section, a municipality or membership corporation shall require the requesting entity to comply with applicable safety requirements, including the National Electrical Safety Code and the applicable rules and regulations issued by the Occupational Safety and Health Administration."  § 62-350(a).

to be owing under a preexisting agreement or regarding safety compliance arising under subsection [62-350](d)." *Id.*[3]  This statute does not apply to utilities "whose poles, ducts, and conduits are subject to regulation under section 224 of the Communications Act of 1934, as amended."[4]  *Id.*

## III.
## CONSTITUTIONALITY OF § 62-350

{20}    Before reaching the merits of the remaining claims, the Court must address the outstanding issue initially posed by the Court regarding the constitutionality of § 62-350.  A review of the language in § 62-350 and Plaintiff's requests in the pleadings and at trial for the Court to "set the rate" for Plaintiff's pole attachments, (Trial Tr. 637), raised concerns for the Court that § 62-350 may have delegated legislative authority to the judiciary in violation of this state's separation of governmental powers and non-delegation provisions, enshrined in Article I, section 6 and Article II, section 1 of the North Carolina Constitution.

{21}    As argued in the briefs responding to the Court's concern, however, "[a] court of this State has no inherent power to review acts of our General Assembly and to declare invalid those which the court disapproves or, upon its own initiative, finds to be in conflict with the Constitution."  *Wood v. Fayetteville*, 43 N.C. App. 410, 415, 259 S.E.2d 581, 584 (1979); *see also State v. Fredell*, 283 N.C. 242, 247, 195 S.E.2d 300, 303 (1973) ("Before deciding an act unconstitutional the question must be presented squarely by a party whose rights are directly involved.").  Because the issue of § 62-350's constitutionality was not raised by either party to this action, the Court does not address the issue further.

---

[3] Subsection (d) of the Statute outlines default safety provisions that apply in the absence of an agreement between an attaching communications service provider and the hosting municipality or membership corporation.  § 62-350(d).

[4] In North Carolina, the power company utilities consist of various investor-owned utilities, municipally-owned utilities and non-profit electric membership corporations.  Pursuant to the federal Pole Attachment Act of 1978, codified as 47 U.S.C. § 224, investor-owned utilities are subject to the regulation and oversight of the Federal Communications Commission.  However, section 224 expressly exempts municipally-owned utilities and non-profit electric membership corporations.  *See* 47 U.S.C. § 224(a)(1).

{22}    Even if the constitutional challenge were properly before the Court, it appears that § 62-350 may be construed in such a way to avoid constitutional concerns.  *See Beaufort County Bd. of Educ. v. Beaufort County Bd. of Comm'rs*, 363 N.C. 500, 505, 681 S.E.2d 278, 282 (2009) (". . . where one of two reasonable constructions will raise a serious constitutional question, the construction which avoids this question should be adopted").

{23}    Pursuant to Article I, section 6 of the North Carolina Constitution, "[t]he legislative, executive, and supreme judicial power of the State government shall be forever separate and distinct from each other."  N.C. CONST. art. I, § 6.  Under Article II, section 1, legislative power is vested in the General Assembly.  N.C. CONST. art. II, § 1.  Thus, "[i]t is settled and fundamental in our law that the legislature may not abdicate its power to make laws nor delegate its supreme legislative power to any other coordinate branch or to any agency which it may create."  *North Carolina Tpk. Auth. v. Pine Island, Inc.*, 265 N.C. 109, 114, 143 S.E.2d 319, 323 (1965) (citation omitted).  And, "the exercise of . . . ratemaking power is a legislative rather than a judicial function."  *State ex rel. Util. Comm. v. Thornburg*, 325 N.C. 463, 468, 385 S.E.2d 451, 454 (1989).

{24}    Despite these constitutional limitations, courts in North Carolina "acknowledge that our separation of powers clause does not prevent the General Assembly 'from seeking assistance, within proper limits, from its coordinate Branches.'"  *Beaufort County Bd. of Educ.*, 363 N.C. at 502, 681 S.E.2d at 281 (quoting *Touby v. United States*, 500 U.S. 160, 165 (1991)); *see also Adams v. North Carolina Dep't of Natural & Econ. Res.*, 295 N.C. 683, 696–97, 249 S.E.2d 402, 410 (1978).  Thus, the General Assembly may direct the Court to adjudicate a disputed issue through traditional fact-finding with adequately defined guiding standards.  *See Beaufort County Bd. of Educ.*, 363 N.C. at 504, 681 S.E.2d at 282 ("Such fact-finding falls within the historic and proper role of the judiciary.").

{25}    Turning to the specific directives of § 62-350, the General Assembly instructs the Court to "resolve any dispute identified in the pleadings consistent with the public interest and necessity so as to derive just and reasonable rates,

terms, and conditions," and to "apply any new rate adopted as a result of the action." § 62-350(c). This language could be interpreted to require the Court to engage in a legislative function by directing it to set a just and reasonable rate for pole attachments. Indeed, Plaintiff initially encouraged the Court to do just that at trial. However, Plaintiff has since clarified that the pleadings and § 62-350 only require the Court to determine whether Defendant's proposed rates, terms, and conditions are just and reasonable. (*See* Pl.'s Supp. Post-Trial Br.) The Court and Defendant agree that such interpretation permits the Court to resolve the issue before it without concern for any perceived constitutional issues.

{26} Under this interpretation, § 62-350 calls upon the Court to engage in fact-finding to resolve disputed issues in the pleadings such that "the judiciary is at all times exercising a function traditionally assigned to it under our tripartite system of government." *See Beaufort County Bd. of Educ.*, 363 N.C. at 504, 681 S.E.2d at 282. Thereafter, if the Court determines that the proposed rate, terms, and conditions are just and reasonable, then the proposed terms would apply retroactively pursuant to § 62-350. On the other hand, if the Court finds that the rate, terms, and conditions are not just and reasonable, the parties would then return to negotiations having available to them the Court's reasoning to derive and adopt just and reasonable rates, terms, and conditions to be applied retroactively pursuant to § 62-350. Neither of these outcomes would require the Court to engage in ratemaking activities reserved to the legislature. Therefore, the Court concludes that this construction of § 62-350 not only provides a reasonable interpretation of the statute, but also avoids the constitutional concerns.

IV.

FINDINGS OF FACT

A.

PARTIES

{27} Plaintiff is a New York general partnership with its principal place of business in New York, New York. As successor in interest to Vision Cable Communications, Inc. ("Vision Cable"), Plaintiff operates as a communications

service provider within the meaning of § 62-350(e). Specifically, Plaintiff provides cable television and broadband services to residential and commercial customers throughout North Carolina.

{28}   Defendant, a North Carolina municipal corporation located in Rowan County, owns and operates a municipal utility that provides electric service to residents within, and surrounding the town of Landis. To provide this service, Defendant constructed and maintains a system of utility poles to which it attaches overhead electric distribution lines. Defendant also licenses use of space on its poles to communications service providers and allows telephone companies to attach to its poles under joint use agreements.

{29}   As part of its business model, Plaintiff and its predecessor Vision Cable rely upon access to utility poles, including poles owned by Defendant, to deliver services to customers. Plaintiff, or its predecessor Vision Cable, has maintained attachments to Defendant's poles since 1979.

B.

BACKGROUND ON POLE ATTACHMENTS

{30}   Utility poles come in standard sizes, typically in five-foot increments. Usually, utilities use 35- and 40-foot poles for distribution of electricity and communications services. Approximately six feet of the pole is buried underground. Then, to meet "minimum grade" for ground clearance, the utility leaves about 18 feet of pole space unused between the ground and any installation. Thus, each pole has roughly 24 feet of unusable space either buried underground or required to achieve minimum ground clearance. And, each 35- and 40-foot pole has 11 feet and 16 feet, respectively, of usable space to accommodate overhead facilities. To calculate proposed rates, both Plaintiff and Defendant rely on an average pole height of 37.5 feet and an average usable space of 13.5 feet. Of the usable space, Defendant generally uses between nine and ten feet for its attachments of electric distribution facilities.

{31}   Incumbent local telephone companies typically occupy one foot of space, but often are entitled to more space and more than one attachment under joint use

agreements with the utility. In this case, Defendant maintains a joint use agreement with Windstream Communications ("Windstream") that reciprocally allows Defendant to attach to poles owned by Windstream at no cost and Windstream to attach to poles owned by Defendant at a rate of $2.00 per pole, per year. Under this agreement, Windstream occupies two feet of usable space on the poles to which it attaches, and Defendant does not require Windstream to apply for permits or notify Defendant prior to attachment. Furthermore, Windstream receives guaranteed space on Defendant's poles such that Defendant must install poles tall enough to accommodate Windstream and cannot kick Windstream off if Defendant needs more pole space.

{32} In addition to its joint use agreement, Defendant also maintains license agreements with communications and cable television providers, like Plaintiff. Plaintiff and these other third-party attachers may occupy only one foot of excess usable space on Defendant's poles.

{33} As of trial, there were 3,125 utility poles in Landis. Of those, Defendant owned 2,724, Windstream owned 302, and Duke Energy owned 9.

C.

THE PARTIES' 1984 AGREEMENT

{34} On June 16, 1984, Vision Cable and Defendant entered into a written pole attachment agreement (the "Agreement"). (Pl.'s Trial Ex. 8.) Under the Agreement, Defendant granted Vision Cable a license to attach cables to excess space on Defendant's utility poles at an annual rate of $3.00 per pole, with an additional charge of $1.00 per year for each metered power supply attachment, to be paid semi-annually. (Pl.'s Trial Ex. 8 ¶ 8.) If an existing pole lacked sufficient space for Vision Cable's attachment, Vision Cable had to pay to create additional space either by rearranging the existing facilities on the pole or installing a taller pole. If Vision Cable paid for the installation of a taller pole, Defendant would own the new pole, and Vision Cable would continue to pay for its attachment to the pole. Defendant also retained the right to reclaim space on the pole and kick Vision Cable off, if needed.

{35}    The Agreement provided for a number of conditions and limitations constraining Vision Cable's access to and use of Defendant's poles:

a. Vision Cable was limited to one attachment per pole;

b. Vision Cable's attachments had to comply with Defendant's permitting requirements;

c. Defendant maintained final approval of Vision Cable's attachments, in its sole discretion (Pl.'s Trial Ex. 8 ¶ 1a);

d. Vision Cable had to place on all attached appliances permanent identification markers that were uniform, clearly visible, and recognizable from the ground (Pl.'s Trial Ex. 8 ¶ 1b);

e. Costs associated with maintenance of attachments, or changes required to safely support Vision Cable's attachments, were to be borne by Vision Cable (Pl.'s Trial Ex. 8 ¶ 2);

f. All Vision Cable attachments were required to comply with standards set forth in the National Electrical Safety Code ("NESC") and any applicable state regulatory requirements (Pl.'s Trial Ex. 8 ¶ 3);

g. Defendant reserved the right, under the Agreement, to refuse to permit pole attachments for solely aesthetic reasons, i.e., where such attachments would prove "unsightly" in Defendant's opinion (Pl.'s Trial Ex. 8 ¶ 3);

h. Defendant could immediately terminate any existing pole attachment permits and require removal of such attachments if it determined that use of particular poles was "forbidden by Municipal authorities or property owners" (Pl.'s Trial Ex. 8 ¶ 13.);

i. Vision Cable's use of Defendant's poles did not confer upon Vision Cable any ownership or property rights (Pl.'s Trial Ex. 8 ¶ 19); and

j. The Agreement also included provisions indemnifying Defendant and requiring Vision Cable to carry insurance as specified.  (Pl.'s Trial Ex. 8 ¶ 10.)

{36} The term of the 1984 Agreement was for a period of "not less than one (1) year" from the date of execution, (Pl.'s Trial Ex. 8 ¶ 20b), and specified that termination could occur by: (i) either party "at the end of said year or at any time thereafter . . . giving . . . the other party at least six (6) months' written notice" (Pl.'s Trial Ex. 8 ¶ 20b); (ii) Vision Cable's failure to correct any default or noncompliance with the terms of the Agreement within thirty (30) days, including nonpayment of bills "for expenses and other charges" (Pl.'s Trial Ex. 8 ¶ 14); or (iii) Vision Cable's failure "to install its cables and appliances throughout [the specified] area within one year from execution" of the Agreement. (Pl.'s Trial Ex. 8 ¶ 20a.) The Agreement expressly provided that it would "extend to and bind the successors and assigns of the parties," (Pl.'s Trial Ex. 8 ¶ 23), and that "[f]ailure to enforce or insist upon compliance with any of the terms or conditions of this [A]greement shall not constitute a general waiver or relinquishment of any such terms or conditions, but the same shall be and remain at all times in full force and effect." (Pl.'s Trial Ex. 8 ¶ 16.)

{37} The Agreement has never been terminated (Trial Tr. 161), there is no evidence before the Court that either party has ever given notice of termination for any reason, and the parties agree that they continue to operate under the terms of the Agreement. (Trial Tr. 119; Def.'s Post-Trial Br. 9 (citing Trial Tr. 120).) Defendant has never enforced the fining provision of the Agreement with respect to any NESC violations, and has never denied Plaintiff permission to attach to any poles. (Trial Tr. 182–83.) Defendant has, furthermore, never billed Plaintiff for costs associated with any new poles. (Trial Tr. 182–83.)

D.

THE PROPOSED NEW AGREEMENT

{38} In 2008, Defendant engaged Edward McGavran ("McGavran") of McGavran Engineering to conduct an audit of Defendant's pole plant and to negotiate a new pole attachment agreement with Plaintiff. (Trial Tr. 140, 374.) McGavran had more than ten years of experience with municipal pole attachments.

{39}    McGavran completed the pole audit by November 2008.  (Trial Tr. 154.) Per the audit, Defendant had an inventory of approximately 3,000 poles, and Plaintiff had approximately 2,100 attachments to 1,594 of those poles.  (Trial Tr. 102, 109; Def.'s Trial Ex. 12.)  The audit further reflected 946 safety or technical violations of varying degrees related to Plaintiff's attachments.  (Trial Tr. 156.)

{40}    McGavran and his staff began to develop a draft of a proposed new pole attachment agreement (the "Proposed Agreement"), and submitted a preliminary draft agreement to Defendant on October 6, 2008.  (Pl.'s Trial Ex. 10.)  McGavran also drafted a proposed amendment to Defendant's municipal pole attachment ordinance (Trial Tr. 358) that was adopted on March 9, 2009.  (Pl.'s Trial Ex. 15.) Among other things, the proposed amendment authorized Defendant to impose, in its discretion, a default pole attachment rate of $50 per year for each attachment of any "telecommunications and cable television provider" that did not sign a "Town approved contract to maintain attachments to the same poles" by April 9, 2009. (Pl.'s Trial Ex. 15.)

{41}    Despite the incorporation of this provision in Defendant's amended ordinance, McGavran did not forward the Proposed Agreement to Plaintiff until August 2009, because he was waiting for the results of the legislative process that ultimately yielded § 62-350.  (Trial Tr. 141–42, 310.)

{42}    Between October 2008 and August 2009, McGavran revised the Proposed Agreement and submitted the revisions to Landis Town Administrator Reed Linn ("Linn") and Landis Director of Public Works Steve Rowland for their review in July 2009.  (Trial Tr. 308.)  The Proposed Agreement, as revised, contained an attachment rate of $18.00 per attached cable for the first year (i.e., 2009). Thereafter, the proposed rate would increase by $1.40 per year for each subsequent year of the proposal (i.e., 2010 through 2014).  (Pl.'s Trial Ex. 9, Schedule 1.)  In addition, the Proposed Agreement provided for multiple charges per pole where Plaintiff's attachments "overlashed" more than one cable per single point of attachment.  (Pl.'s Trial Ex. 9 § 1.)  The Proposed Agreement also included a $10-per-pole permitting fee and a $15-per-day penalty, upon 30-days' written notice of

violation by Defendant, for any attachment that failed to comply with NESC and Occupational Safety and Health Administration ("OSHA") requirements or that did not conform to certain technical specifications. (Pl.'s Trial Ex. 9 §§ 4, 6(c), 6(e).)

{43}   On August 3, 2009, Plaintiff received a letter drafted by McGavran and signed by Linn, accompanied by the Proposed Agreement. (Trial Tr. 141–42.) The letter stated that "[the Town] expect[s] this document [i.e., the Proposed Agreement] to be executed within 30 days of receipt of this letter. If this does not occur, we will charge you the default rate as stated in our pole attachment ordinance passed last spring." (Pl.'s Trial Ex. 23.) The letter also drew Plaintiff's attention to the Proposed Agreement's revised definition of the applicable pole attachment unit charge from per-pole to per-cable, explaining that "[t]his is in line with standard procedures within the industry for those attaching entities that do not own poles." (Pl.'s Trial Ex. 23.) In the letter McGavran promised to forward to Plaintiff the results of an inventory of "poles, attachments, violations and other items" within 10 business days (i.e., by August 17, 2009). (Pl.'s Trial Exs. 23–24.) McGavran did indeed forward a summary of the pole inventory to Plaintiff on August 27, 2009. (Def.'s Trial Ex. 12; Trial Tr. 395.)

{44}   In a letter to Linn dated August 31, 2009, Nestor Martin (Plaintiff's Senior Director of Construction for the Carolinas) sent Defendant a request to negotiate a new pole attachment agreement pursuant to § 62-350. (Pl.'s Trial Ex. 25.) Martin noted that Defendant failed to provide specific information regarding the 946 violations attributed by McGavran to Plaintiff's existing attachments, and requested certain cost and valuation data regarding Defendant's pole plant and electric service to evaluate the attachment rate included in the Proposed Agreement. (Pl.'s Trial Ex. 25.) Plaintiff later obtained an editable version of the Proposed Agreement and created its own redlined version that reflected deletions of Defendant's proposed attachment rates. (Pl.'s Trial Ex. 26.) Plaintiff forwarded the redlined version to Defendant.

{45} At trial, McGavran indicated that the $18-per-cable attachment rate was advanced "for negotiation purposes," (Trial Tr. 328–329),[5] and included $2.40 above a rate calculated by McGavran and his team. (Trial Tr. 337–40.)[6] McGavran represented to the Court that the $1.40-per-year rate increases expressed in the Proposed Agreement were also included for "negotiation purposes." (Trial Tr. 328.) According to McGavran, the actual rate that might have resulted from the negotiation could well have varied from the $18.00 rate, stating that "[w]e could have agreed on something under that, I would think. It could have been higher as well, could have moved either way." (Trial Tr. 329.)

{46} Despite good faith efforts to resolve their differences through negotiations, the parties failed to reach an agreement. Thereafter, on January 5, 2010, Plaintiff's counsel, Gardner F. Gillespie, sent a letter to Linn declaring an impasse and requesting mediation. The parties continued to discuss the disputed issues but could not reconcile their positions, leading Plaintiff to file the current action. Notwithstanding their disagreement, Plaintiff paid the undisputed fees owed for 2009, pursuant to the terms of the 1984 Agreement.

E.

ANALYZING DEFENDANT'S PROPOSED RATE

{47} In vesting this Court with the exclusive jurisdiction to resolve disputes regarding pole attachment rates charged by municipalities, the General Assembly articulated a policy for this Court to implement. It requires the Court to "tak[e] into consideration and apply[] such other factors or evidence that may be presented by a party, including without limitation the rules and regulations applicable to attachments by each type of communications service provider under section 224 of the Communication Act of 1934, as amended." § 62-350(c). As noted by the Court of Appeals, § 62-350 "endorses regulatory intervention to promote 'just and reasonable

---

[5] In setting the rate for the Proposed Agreement, McGavran testified that he took into account the thirty-year period during which Plaintiff's attachments to Defendant's poles were permitted at the rate of $3 per pole, a rate McGavran viewed as "unreasonably low." (Trial Tr. 341–42.)
[6] The trial testimony of McGavran and McGavran Engineering employee John Talbert showed that, in developing the rate included in the Proposed Agreement, Talbert calculated a rate of $15.60 based on Defendant's pole plant and other financial information. (Trial Tr. 267, 322.)

rates.'" *Town of Landis*, 747 S.E.2d at 616.  While the Court may consider and apply other evidence presented by the parties to determine whether Defendant's rates are just and reasonable, the Court looks first to the methods applied by the Federal Communications Commission ("FCC") for setting maximum just and reasonable pole attachment rates under section 224 of the Communications Act of 1934, as amended ("Section 224").[7]

{48}    The FCC has two rate methodologies, the FCC Cable Rate and the FCC Telecom Rate.  However, the FCC revised the FCC Telecom Rate in 2011 to yield a maximum rate that is essentially the same as the maximum rate produced by the FCC Cable Rate.[8]  The FCC Cable Rate calculates the maximum just and reasonable rate that a pole owner may charge based on an appropriately allocated share of the actual, documented costs of owning and maintaining a pole.

{49}    As this Court previously observed in a similar case,

> [The FCC Cable Rate] assigns to the attaching party a percentage of the cost of the entire pole equal to the proportion of the average pole's usable space occupied by the attacher.  For example, if the average pole on [Defendant's] system has 13.5 feet of usable space and [Plaintiff's] attachment uses one foot of that space, the FCC method would assign 1/13.5 or 7.4 percent, of the annual costs of the entire pole to [Plaintiff].

*Rutherford Elec. Membership Corp. v. Time Warner Entm't Advance/Newhouse P'ship*, 2014 NCBC 20 ¶ 54 (N.C. Super. Ct. May 22, 2014), http://www.ncbusiness court.net/opinions/2014_NCBC_20.pdf.

---

[7] For approximately thirty-five years, the FCC has regulated the pole attachment rates investor-owned utilities may charge cable television providers pursuant to Section 224.  Among other things, Section 224 mandates just and reasonable pole attachment rates, terms and conditions for cable television providers, and vests the FCC with oversight and enforcement.  47 U.S.C. § 224(b) (2014). Specifically, Congress instructed the FCC to constrain the rates investor-owned utilities charge for pole attachments within a zone of reasonableness between (i) the utility's incremental costs incurred in providing pole attachment service and (ii) an appropriate share of its fully allocated costs – those costs that would exist even in the absence of any pole attachments.  47 U.S.C. § 224(d).  To establish the upper limit for investor-owned utility pole attachment rates, the FCC developed and implemented a fully allocated cost methodology, known as the FCC Cable Rate.  However, since 1978, Congress has exempted municipally-owned utilities and non-profit electric membership corporations from this federal regulatory scheme.

[8] Neither Plaintiff nor Defendant relies on the FCC Telecom Rate to gauge the reasonableness of Defendant's proposed attachment rate.

{50} As in *Rutherford*, the facts presented in this case demonstrate that the FCC Cable Rate provides a reasonable means of allocating costs without creating a subsidy from the pole owner to the attacher. The Court thus finds that it is appropriate to consider the rates yielded by the FCC Cable Rate formula to assess the reasonableness of Defendant's proposed rate.

1.

RATES UNDER FCC CABLE RATE FORMULA

{51} Plaintiff's expert Patricia Kravtin ("Kravtin") provided evidence of Defendant's maximum just and reasonable rates under the FCC Cable Rate formula. The Court finds that her calculations are faithful to the FCC Cable Rate formula, and derived a maximum rate of $3.30. (Pl. Ex. 109.)

{52} To calculate this amount, Kravtin used FCC methodology to (i) determine the net cost of an average utility pole; (ii) multiply that cost by carrying charge factors to determine the utility's annual cost of owning and maintaining an average pole; and (iii) then allocate a portion of that annual cost to the third-party attacher.

{53} Defendant agrees with this general formula, but, nonetheless, challenges the values Kravtin assigns to the variables. Specifically, Defendant takes issue with Kravtin's use of eight "benchmark" utilities to calculate the net cost of an average pole in Defendant's system.

{54} Because Defendant does not keep records of either the original investment or the accumulated depreciation of utility poles, both sides had to come up with proxies to derive net pole cost. For her proxy, Kravtin looked to eight other utilities, and determined the percentage of their overall system represented by their investment in their utility poles. She then calculated the average of these eight percentages, and applied that average percentage to Defendant's total investment to derive an estimated investment in utility poles. She also performed a similar calculus to derive the accumulated depreciation of Defendant's utility poles.

{55} However, as Defendant argues, Kravtin did not pick these eight utilities because of any noted similarity with Defendant. Instead, she merely pulled them from a 2010 FCC Proposed Order and Rulemaking that explained how the FCC's

proposed formulas were to be calculated. As noted by Defendant's experts, Kravtin's use of these "benchmark" utilities to derive a proxy for net pole cost appears inherently flawed, given that neither Kravtin nor the FCC selected these eight utilities based on any shared characteristics with Defendant.

{56} Nonetheless, if Kravtin's inputs for net pole cost and carrying charge were substituted for those proposed by Defendant's expert, Bill Barta ("Barta"), and multiplied by the allocation factor calculated under the FCC Cable Rate, then the maximum attachment rate would still be only $5.92.[9] Therefore, even tossing out Kravtin's problematic calculation for net pole cost, the FCC Cable Rate still produces a maximum rate far below the $18.00 rate proposed by Defendant.

2.

### DEFENDANT'S EVIDENCE DOES NOT SUPPORT ITS RATE

{57} All the witnesses agree on the same general formula for calculating just and reasonable rates: (i) determine the net cost of an average utility pole; (ii) multiply that cost by carrying charge factors to determine the utility's annual cost of owning and maintaining an average pole; and (iii) then allocate a portion of that annual cost to the third-party attacher. However, Defendant and its experts incorporate various modifications to the variables.

a.

### DEFENDANT'S ORIGINAL METHODOLOGY

{58} In arriving at the proposed $18.00 rate, McGavran relied on Defendant's financial records to calculate the cost of the usable and unusable space. He then allocated the cost of the usable space using the same factor that Kravtin applied under the FCC Cable Rate, 7.41%. To allocate the unusable space, however, McGavran divided the cost of the unusable space by three, and apportioned one third of the unusable space to Plaintiff. McGavran explained at trial that he

---

[9] Barta calculated a carrying charge percentage of 22.25% and a net pole cost of $359.19. Thus, he derived the annual cost of owning and maintaining a pole at $79.92. Defendant does not refute that, under the FCC Cable Rate formula, the presumptive allocation factor would be 1/13.5 or 7.41%. And, multiplying Barta's annual cost of owning and maintaining a pole ($79.92) by the FCC Cable Rate allocation factor (7.41%) produces a rate limit of $5.92.

allocated one third of the unusable space to Plaintiff because Plaintiff wanted to use one foot of space within the three feet of usable space allotted for communications attachments. Following this logic, if Windstream or another attacher licensed the other two feet of space within this "communications zone," then the entire cost of the unusable space would be allocated to the attachers. Thus, even though Defendant enjoys significantly more rights to the pole, it would not bear any portion of the cost for the unusable space under the rate calculation proposed by McGavran.

{59} Even if McGavran's calculation was defensible, McGavran did not use the rate purportedly derived from this method. Although McGavran purportedly calculated a rate of $15.60, he added $2.40 to that rate to account for other costs. However, the evidence produced at trial failed to justify these additional costs. Therefore, the Court finds that McGavran's calculations do not support the $18.00 proposed rate.

b.

DEFENDANT'S EXPERT TESTIMONY

{60} Defendant's first expert, Barta, performed a rate analysis in an effort to support Defendant's rate. Although Barta relied on various modifications to the variables in the general formula used by Kravtin, the principal difference between the parties' experts is the proper allocation factor to use in apportioning cost.[10]

{61} In his calculations, Barta allocated the cost of the usable space in the same manner as the FCC Cable Rate. However, he allocated the cost of the unusable space per capita based on the average number of attaching entities as determine by a pole audit performed by McGavran Engineering.

{62} The Court finds that the evidence does not justify using Barta's allocation approach. The additional rights and usable space afforded to Defendant warrant allocating a proportional share of the cost of the unusable space, rather than an

---

[10] Although Plaintiff challenges Barta's use of select data from Defendant's financial records to compute the net pole cost, it appears that the key disagreement lies with the allocation factor. In fact, as previously stated, when Barta's values for net pole cost and carrying charge are used with the allocation factor relied on by Kravtin pursuant to the FCC Cable Rate, the resulting rate still falls far short of the proposed rate of $18.00.

amount equal to the cost allocated to third-party attachers like Plaintiff.  Defendant makes much greater use of the pole than any other party, and only grants Plaintiff the right to use surplus space on the pole.  Moreover, Plaintiff must pay to install a taller, stronger pole if necessary to make surplus space for its attachment.

{63}  In an attempt to justify Barta's approach, Defendant proffered the expert testimony of Roger Spain ("Spain"), a certified public accountant.  Spain testified that it is reasonable to allocate the unusable space equally among the attachers because they each have an equal need for this space to elevate off the ground.  While technically true, this justification does not account for the significantly greater rights vested in Defendant as the pole owner.  If the third-party attachers retained equal rights to the pole, then it would be reasonable to expect them to bare an equal share of cost of the unusable space needed to achieve ground clearance.  In this case, the record does not support such a finding.

{64}  Plaintiff is limited to attach only to surplus space on Defendant's poles, and remains subject to Defendant's approval for each attachment, in Defendant's sole discretion.  Furthermore, Defendant may at any time reclaim space on its poles to Plaintiff's detriment.  In that instance, or if Plaintiff needs additional space for its own attachment, Plaintiff must pay to install a new pole at its own expense, which Defendant takes ownership of and continues to charge Plaintiff rent to occupy space on the pole.  Although Defendant may not have exercised these rights at the time of trial, the Agreement and Proposed Agreement still grant Defendant the power to do so at any time pursuant to express terms.  These additional rights make a proportional allocation based on the attacher's use of the usable space reasonable, and negate the rationality of Barta and Spain's conclusions.  Therefore, the Court finds Barta and Spain's testimony and calculations unreasonable in light of the facts presented in this case, and does not rely on either to find Defendant's rate just and reasonable.

3.

### DEFENDANT'S RATE IS NOT JUST AND REASONABLE

{65}    Because Defendant's proposed $18.00 rate exceeds the maximum just and reasonable pole attachment rate calculated under the FCC Cable Rate formula and is not otherwise supported by the evidence and methodologies proffered by Defendant and its experts, the Court finds Defendant's rate of $18.00 unjust and unreasonable.[11]

F.

### ANALYZING DEFENDANT'S TERMS AND CONDITIONS

{66}    Plaintiff also challenges Defendant's proposal to charge Plaintiff on a per-cable basis and Defendant's proposed fining mechanism for non-conforming attachments.

1.

### DEFENDANT'S PER-CABLE CHARGE

{67}    Under the 1984 Agreement, Defendant charged Plaintiff on a per attachment basis for one foot of pole space.  Now, Defendant proposes to charge Plaintiff based on the number of cables affixed to its attachments.  This arrangement would double Plaintiff's rate for any pole with two cables attached within its one-foot of pole space.  However, all the rate calculations proposed by both sides rely on the pole costs associated with one foot of pole space, and produce a rate based on one foot of space, regardless of how many cables are attached in that space.

{68}    Because the individual cables are either contained in a single bundle or are overlashed on top of an existing attachment, it does not appear that Defendant incurs any significant, additional costs due to multiple cables being affixed to a single attachment within Plaintiff's one foot of space.  And, even if it did, Defendant

---

[11] Given the Court's findings regarding the proposed $18.00 rate, the Court similarly finds that the $50.00 default rate set by Defendant's ordinance is unjust and unreasonable.  However, the Court notes that it does not appear that Defendant ever attempted to charge Plaintiff the default rate nor did Defendant attempt to justify the $50.00 default rate through evidence produced at trial.

offered no evidence at trial to justify charging the same rate for each cable to recoup those additional costs.

{69}    Under the Proposed Agreement, Plaintiff is assigned one foot of space on Defendant's poles, and every witness who proposed a rate based his or her calculation on that allotment, not on Plaintiff's attachment of multiple cables within its one foot of space.  Accordingly, the Court finds that Defendant's proposal to charge Plaintiff rent on a per-cable basis is unjust and unreasonable.

2.

DEFENDANT'S FINING MECHANISM

{70}    In the Proposed Agreement, Defendant also included a provision for a $15-per-day penalty, upon 30-days' written notice of a violation, for any attachment that failed to comply with certain safety and technical requirements.

{71}    If no agreement existed between the parties, then the default provisions in § 62-350 would apply.  In that case, the communications service provider would have 60 days after notice of a violation from the municipality to remedy the violation.  Even still, the communications service provider could extend that time "as may be deemed reasonable under the circumstances" if it could not complete the work within the 60-day time frame.  § 62-350(d)(1).  Furthermore, § 62-350 provides the communications service provider with the opportunity to contest the violation. In any case, if the communications service provider failed to remedy the violation and the municipality was forced to address it, then the municipality could recover from the communications service provider the reasonable and actual costs incurred to fix the violation.  § 62-350(d)(3).

{72}    Although Plaintiff first contests the reasonableness of the penalty proposed by Defendant, none of the evidence produced at trial adequately rebutted the reasonableness of the proposed $15 per-day provision.  Even though the $15 per-day penalty exceeds the cost-based rates proposed under the rate analysis, the evidence produced at trial failed to sufficiently disprove this amount when charged as a penalty for violations.

{73}   However, due to the nature of pole attachments, it is clear that certain violations can be caused by or at least implicate the other parties attached to the pole.  For example, one of the other attachers could cause the violation in question by attaching too close to Plaintiff.  Without any mechanism to challenge the noticed violations, Plaintiff would be left without any recourse under the proposed terms if another attacher caused the violation.  And, even where Plaintiff is the violating party, the curative measures could implicate the other attachers if their attachments need to be moved to accommodate Plaintiff's attachment.  In that instance, Plaintiff may need significant time to coordinate with the other attachers to address its violation, but under the proposed terms, it would have no any means to request additional time.  Such provisions cannot be deemed reasonable.

{74}   The evidence demonstrated that neither the FCC, the NESC, nor the parties' 1984 Agreement impose any time restraints on attachers in addressing violations.  And, under § 62-350's default time restraints, the communications service providers receive a means to challenge the assessed violations and request additional time to cure them.  Even McGavran, who purportedly drafted the Proposed Agreement, testified that he did not want a strict time limit, but rather, preferred to work with the attachers to cure violations over time.  (Trial Tr. 388–90.)  Indeed, at the time of trial, Defendant had not cured all of its own violations attributed to it in McGavran's pole audit from 2008.

{75}   In light of the evidence, the Court finds that, although the penalty may be just and reasonable, it cannot be upheld without some mechanism for Plaintiff to challenge the noticed violations or, at the very least, request additional time to coordinate its efforts to cure the violations with the other attachers where necessary.  Therefore, the Court finds Defendant's proposed fining mechanism unjust and unreasonable.

G.

VIOLATION OF NONDISCRIMINATION REQUIREMENT

{76} The Court finds that the evidence produced at trial does not support Plaintiff's claim for violation of the nondiscrimination requirement.[12] Neither Windstream nor Defendant are similarly situated with Plaintiff. In light of the evidence produced at trial, the Court finds that Defendant did not violate § 62-350's nondiscrimination requirement.

V.

CONCLUSIONS OF LAW

{77} This Court has jurisdiction under § 62-350 and North Carolina's Declaratory Judgment Act, N.C. Gen. Stat. §§ 1-253 to 1-257, to hear and determine the claims for relief regarding the reasonableness of Defendant's pole attachment rate, terms and conditions.

{78} The ultimate disposition of the claims in this action present questions of statutory interpretation. "The primary rule of construction of a statute is to ascertain the intent of the legislature and to carry out such intention to the fullest extent." *Applewood Props., LLC v. New South Props., LLC*, 366 N.C. 518, 522, 742 S.E.2d 776, 779 (2013) (quoting *Dickson v. Rucho*, 366 N.C. 332, 339, 737 S.E.2d 362, 368 (2013)). To discern the intent of the legislature, the Court looks first to the plain language of the statute. *Lenox, Inc. v. Tolson*, 353 N.C. 659, 664, 548 S.E.2d 513, 517 (2001). "If the language of a statute is clear, the court must implement the statute according to the plain meaning of its terms so long as it is reasonable to do so." *Id.* (citation omitted).

{79} Under § 62-350, only municipalities, membership corporations organized under Chapter 117 of the General Statutes, and communications service providers may bring claims for relief under the statute. Having found that Plaintiff is a

---

[12] Pursuant to Rule 41(a)(1), Plaintiff may take a voluntary dismissal of any claim "at any time before the plaintiff rests his case." N.C. R. Civ. P. 41(a)(1). However, here, Plaintiff attempted to abandon its claim well after it rested its case. Indeed, Plaintiff declared its dismissal after Defendant rested its case and moved for directed verdict. Therefore, the Court resolves this remaining claim despite Plaintiff's attempted voluntary dismissal.

communications service provider as contemplated by § 62-350, the Court concludes that Plaintiff has standing to pursue the claims. Furthermore, given that Plaintiff submitted a request to negotiate and the parties thereafter failed to reach an agreement despite good faith efforts to negotiate, the Court concludes that the claims are properly before it for determination under § 62-350, and are not otherwise precluded or barred by any affirmative defenses raised by Defendant.

{80} In assessing the Defendant's proposed rates, terms, and conditions under § 62-350, Defendant first argues that the Court must grant its decisions significant deference. The Court agrees that municipalities are afforded broad discretion to operate their own utilities. *See Carolina Water Serv. v. Town of Pine Knoll Shores*, 145 N.C. App. 686, 689, 551 S.E.2d 558, 560 (2001). And, it is presumed that a municipality acts within the public interest where it takes an action within its discretion, and thus, such acts are entitled to a certain amount of deference. *Greene v. Town of Valdese*, 306 N.C. 79, 82, 291 S.E.2d 630, 632 (1982) (quoting *In re Annexation Ordinance*, 284 N.C. 442, 452, 202 S.E.2d 143, 149 (1974)).

{81} However, here, § 62-350 expressly limits Defendant's discretion in this area. *See* § 62-350(a) ("A municipality . . . *shall* allow any communications service provider to utilize its poles, ducts, and conduits at just, reasonable, and nondiscriminatory rates, terms, and conditions . . . ." (emphasis added)). Nowhere in the statute does the General Assembly grant municipalities discretion to set their own rates, terms and conditions unilaterally. To the contrary, § 62-350 mandates that municipalities must negotiate with communications service providers to reach a mutual agreement on just and reasonable rates, terms and conditions. The Court cannot conclude that § 62-350 confers upon municipalities the same deference in the operation of their utilities as normally would apply. Instead, the statute directs the Court to "resolve any dispute . . . consistent with the public interest and necessity so as to derive just and reasonable rates, terms, and conditions, taking into consideration and applying such other factors or evidence that may be presented by a party, including without limitation the rules and regulations . . . under [Section 224]." § 62-350(c). This language does not imply or expressly provide for deference

to the proposed rates, terms, and conditions proffered by the municipality in resolving the dispute before the Court.

{82}   Regardless, even assuming Defendant's proposed rates, terms, and conditions were entitled to deference, this presumption may be overcome by competent and substantial rebuttal evidence. *Greene*, 306 N.C. at 82, 291 S.E.2d at 632–33.  As stated by the North Carolina Supreme Court,

> [t]he presumption of regularity of official acts is rebuttable by affirmative evidence of irregularity or failure to perform duty, but the burden of producing such evidence rests on him who asserts unlawful or irregular conduct. . . . Hence the burden is on the petitioner to overcome the presumption by competent and substantial evidence.

*Id.* (quoting *In re Annexation Ordinance*, 284 N.C. at 452, 202 S.E.2d at 149).  At trial, Plaintiff produced sufficient competent evidence to overcome this presumption, if indeed such a presumption applied.  Therefore, although the Court concludes that Defendant is not entitled to deference under § 62-350, the Court also concludes that a contrary determination would not change the findings and conclusions reached herein.

{83}   In *Rutherford*, the Court previously interpreted § 62-350 as requiring consideration of the FCC rules and regulations under Section 224, including the FCC Cable Rate. *Rutherford Elec. Membership Corp. v. Time Warner Entm't Advance/Newhouse P'ship*, 2014 NCBC 20 ¶ 90 (N.C. Super. Ct. May 22, 2014), http://www.ncbusinesscourt.net/opinions/2014_NCBC_20.pdf.  "However, § 62-350 clearly does not limit the Court's consideration to only the rules and regulations applicable under Section 224." *Id.*  While the Court looked to FCC Cable Rate, the Court also considered and weighed the other methods proffered by Defendant. Based on the record before the Court in this case, the FCC Cable Rate offered the most credible basis for assessing the reasonableness of Defendant's rate.

{84}   Having resolved the issues in dispute, § 62-350 finally directs the Court to "apply any new rate adopted as a result of the action retroactively . . . to the date immediately following the end of the existing agreement." § 62-350(c).  Having found Defendant's rate, terms, and conditions unjust and unreasonable, the Court

directs the parties to negotiate and adopt a new rate consistent with the reasoning in this Order and Opinion. Thereafter, the rate adopted shall be applied retroactively to the date immediately following the end of the existing agreement.

VI.

CONCLUSION

{85} For the above stated reasons, the Court ORDERS and DECLARES as follows:

a. Plaintiff's claim for violation of § 62-350's nondiscrimination requirement is DISMISSED with prejudice;

b. Defendant's $18.00 attachment rate is unjust and unreasonable, in violation of § 62-350;

c. Defendant's proposal to charge Plaintiff separately for each cable attached to a pole is unjust and unreasonable, in violation of § 62-350;

d. Defendant's proposed contract term imposing a fining mechanism for nonconforming attachments is unjust and unreasonable, in violation of § 62-350;

e. Within 90 days, the parties shall confer and adopt a new rate in accordance with the reasoning outlined in this Order and Opinion;

f. Upon adopting a new rate, the new rate shall apply retroactively to the date immediately following the end of the existing agreement; and

g. The Court retains jurisdiction to enforce the provisions in this Order and Opinion, and to grant such further and supplemental relief as may be required.

SO ORDERED, this the 24th day of June, 2014.